Rick WILDER, Appellant (Plaintiff),

v.

**CODY COUNTRY CHAMBER OF COM-MERCE, a Wyoming non-profit corporation, Appellee (Defendant).**

No. 93–22.

Supreme Court of Wyoming.

Jan. 25, 1994.

L.B. Cozzens of Crowley, Haughey, Hanson, Toole & Dietrich, Billings, MO, for appellant.

Gary R. Scott of Hirst & Applegate, Cheyenne, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

TAYLOR, Justice.

Following the termination of his employment, a former executive director of a non-profit corporation brought this action. In a multi-count complaint, the former executive director alleged breach of contract, bad faith and various tort claims against the corporation. The district court granted summary judgment on all counts in favor of the corporation. The district court found that despite the terms of a letter placing the former executive director on probationary status pending completion of an audit, his employment was "at will" and could be terminated without cause.

We affirm in part, reverse in part and remand.

## I. ISSUES

Appellant, the former executive director of the non-profit corporation, presents two issues for review:

A. Are there genuine issues of material fact which preclude summary judgment in favor of the Appellee on any of the claims asserted by the Appellant?

B. Did the trial court abuse its discretion in denying the Appellant's timely motion for leave to amend his complaint?

Appellee, the non-profit corporation, states three issues:

A. Did the Trial Court Err in granting summary judgment for Appellee upon the Appellant's claims for breach of contract, bad faith termination, intentional infliction of emotional harm, negligence, libel and slander, and intentional interference with prospective business relations?

B. Did the Trial Court abuse its discretion in denying Appellant's Motion for Leave to Amend his Complaint?

C. Can this Court properly consider as part of the record the Attorney's Affidavit filed by Appellant?

## II. FACTS

In 1986, Rick Wilder (Wilder) closed his real estate brokerage to accept the position of executive director of the Cody Country Chamber of Commerce (Chamber) in Cody, Wyoming. The Chamber is a non-profit corporation controlled by a Board of Directors (Board) and a President who serve for terms of office. Wilder considered his employment to be "permanent" for "as long as I did the work that was required." Wilder commenced his employment without a written contract; however, he maintained that Chamber officials promised, during an annual performance review, to prepare a written agreement similar to the one under which his predecessor had been employed.

As the chief administrator for the Chamber, Wilder's duties required that he supervise the Chamber's staff, including the budget manager. The budget manager's duties involved preparation of monthly financial statements and controlling the accounts receivable and accounts payable transactions of the Chamber. During portions of 1987 and 1988, the budget manager failed to pay certain taxes due to the Internal Revenue Service (IRS). The budget manager claimed that periodic cash flow problems prevented the prompt payment of the taxes and other bills.

In late 1988, an IRS agent notified Wilder of the delinquent taxes. Wilder and the budget manager met with the IRS agent in January of 1989 and agreed to a payment schedule. Wilder did not disclose the financial problem to the Board or to the President.

While Wilder was traveling in March of 1989, the budget manager became ill and other staff members were required to review her files. The review disclosed that numerous checks payable to the Chamber had not been deposited, bills owed by the Chamber were unpaid and taxes were delinquent. The Board learned of the financial problems from members of the Chamber staff.

On March 29, 1989, the Board met with Wilder when he returned to Cody and discussed the Chamber's financial problems. After the meeting, the President presented

Wilder with a "memorandum of understanding." Dated March 31, 1989, the memorandum placed limits on Wilder's non-employment related activities. Additionally, the memorandum stated, in pertinent part:

Your status is probationary through July 1, 1989, or upon completion of an audit of the Chamber books, which may be completed sooner than July 1, 1989. Upon completion of the audit, and the opportunity to review it, the Board will evaluate your status and whether or not to offer you continued employment. The Board reserves the right to consider past employment performance, and review will not be limited to your performance during the probationary period. The Board believes that the entire financial and management picture of Chamber operations should be before them prior to a decision regarding your future employment. In other words, the Board wants all the facts before them, and as such the probationary period is in no way to operate as a waiver of the Board's right to consider performance prior to the probationary period. You are an at will employee, and the Board has the right to terminate at any time for any reason, or for no reason at all. However, we insist on knowing all the facts before any action is taken. Again, you serve at the pleasure of the Board.

Additionally, the memorandum required Wilder to spend a minimum of one day per week improving financial oversight at the Chamber and to receive prior approval for all out-of-town travel. Another term of the memorandum deleted a car allowance and insurance coverage from Wilder's compensation package. Despite his belief that he was an employee subject to dismissal only for cause, Wilder signed and accepted the terms of the memorandum of understanding on April 4, 1989.

On April 18, 1989, the Board met with Wilder and the budget manager. Board members inquired about the financial problems at the Chamber and when Wilder learned of the delinquent taxes. At the conclusion of the meeting, the Board informed Wilder that he had the option of resigning his position immediately or being terminated the next day. Wilder resigned. It is undisputed that the audit referred to in the memorandum of understanding with Wilder had not yet been completed.

Following his termination, Wilder attempted to secure other employment in Cody. When Wilder was considered for a position with the Park County Travel Council, the Park County Travel Council was informed by the Chamber President that the Chamber could not work with Wilder. The President suggested that a Chamber employee perform the desired work for the Park County Travel Council instead of Wilder. Later, Wilder also sought employment with the Yellowstone Airport Board and presented a marketing proposal. Again, Chamber officials objected to Wilder's employment. The Chamber presented an unsolicited alternative marketing plan that utilized a Chamber employee's services. The Chamber's plan was implemented.

On October 10, 1991, Wilder filed a complaint seeking compensatory and punitive damages from the Chamber. Wilder based his damage claims on several causes of action including: breach of contract; bad faith termination; negligence; intentional infliction of emotional harm; libel and slander; intentional interference with prospective business relations; and negligent interference with prospective business relations. Subsequently, Wilder withdrew the claim for negligent interference with prospective business relations. The Chamber denied the allegations of the complaint and filed a counterclaim seeking damages for Wilder's negligent breach of his employment duties; breach of his oral, at will, employment contract; and negligent misrepresentation.

On October 26, 1992, the Chamber filed a motion for summary judgment. Three days later, Wilder filed a motion for leave to amend the complaint to bring individual actions against some present and former officers, members of the Board, and employees of the Chamber. Wilder also sought to state additional causes of action against the Chamber, including promissory estoppel, fraud, and negligent misrepresentation.

The district court denied Wilder's motion for leave to amend the complaint and granted

summary judgment, on all counts, in favor of the Chamber. Specifically, the district court determined that Wilder was an at will employee at the time of his termination. The district court refused to consider whether Wilder had stated a cause of action for bad faith termination because that action was not recognized in Wyoming. The district court found that the evidence was close, but the Chamber had not intentionally interfered with prospective business relations by performing tasks that other organizations had considered hiring Wilder to do.

Subsequently, the Chamber filed a motion to dismiss the counterclaim against Wilder, without prejudice, which was granted. Wilder filed this appeal to challenge the summary judgment.

### III. DISCUSSION

A summary judgment is affirmed when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. W.R.C.P. 56(c). Summary judgment serves the purpose of eliminating formal trials where only questions of law are involved. *Bryant v. Hornbuckle*, 728 P.2d 1132, 1135 (Wyo.1986). Summary judgment is inappropriate to resolve factual disputes, so the court does not weigh disputed evidence. *Cordova v. Gosar*, 719 P.2d 625, 637–38 n. 6 (Wyo.1986) (collecting cases); *Territorial Sav. & Loan Ass'n v. Baird*, 781 P.2d 452, 456 (Utah App.1989).

■ At the appellate level, the party who opposed the motion is given the benefit of any reasonable doubt and inferences drawn from the affidavits, depositions, and exhibits presented as underlying facts and are viewed in the light most favorable to that party. *Keehn v. Town of Torrington*, 834 P.2d 112, 114 (Wyo.1992); *Powder River Oil Co. v. Powder River Petroleum Corp.*, 830 P.2d 403, 406–07 (Wyo.1992); 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2716 at 643 (1983 & Cum.Supp.1993). An issue of material fact which would preclude summary judgment is found when a disputed fact, if proven, would establish or refute one of the essential elements of a cause of action or a defense which has been asserted.

*Keehn*, 834 P.2d at 114; *Stratman v. Admiral Beverage Corp.*, 760 P.2d 974, 978 (Wyo. 1988). This court accords no deference to the district court's decisions on issues of law. *Prudential Preferred Properties v. J and J Ventures, Inc.*, 859 P.2d 1267, 1271 (Wyo. 1993).

### A. BREACH OF CONTRACT

■ Wyoming has long recognized that the hiring of an employee by an employer occurs by contract. *See, e.g., Casper Nat. Bank v. Curry*, 51 Wyo. 284, 65 P.2d 1116, 1120 (1937). When reviewing the terms of a contract of employment, we apply our usual rules of contract interpretation. *McDonald v. Mobil Coal Producing, Inc.*, 820 P.2d 986, 988 (Wyo.1991) (*McDonald II*). Whether a contract is ambiguous is a question of law for the reviewing court. *Prudential Preferred Properties*, 859 P.2d at 1271. " 'If the meaning of a contract is ambiguous or not apparent, it may be necessary to determine the intention of the parties from evidence other than the contract itself, and interpretation becomes a mixed question of law and fact.' " *Alexander v. Phillips Oil Co.*, 707 P.2d 1385, 1387 (Wyo.1985) (*quoting Mobil Coal Producing, Inc. v. Parks*, 704 P.2d 702, 706 (Wyo.1985)).

■ The contract of employment is created by either an express contract or a contract implied in fact. Express contracts are ones in which the terms are declared by the parties either in writing or orally at the time the contract is formed. 17 C.J.S. *Contracts* § 3 at 552 (1963). Express contracts of employment, both written and oral, were recently at issue in *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 540 (Wyo.1993) (holding covenant not to compete which was ancillary to a valid contract of employment would be enforced to the extent its terms were reasonable).

■ The implied in fact contract of employment arises from a mutual agreement and intent to promise which is found in the acts or conduct of the party sought to be bound. 17 C.J.S. *Contracts, supra*, § 4 at 555; Restatement (Second) of Contracts §§ 18–19 (1981) (stating rules that assent to

the formation of informal contracts must be manifested by words, acts or conduct). *See McDonald II*, 820 P.2d at 990 (adopting Restatement (Second) of Contracts, *supra*, § 19). Contracts of employment which· are found from employee handbooks or policies are implied in fact contracts. *See, e.g., Sanchez v. Life Care Centers of America, Inc.*, 855 P.2d 1256 (Wyo.1993) and *McDonald v. Mobil Coal Producing, Inc.*, 789 P.2d 866, 869 (Wyo.1990) (hereinafter *McDonald I* ). Both express and implied in fact contracts of employment are. enforceable to the same degree. *Bell v. Superior Court (20th Century Ins. Co.)*, 215 Cal.App.3d 1103, 263 Cal.Rptr. 787, 789 (1989). The distinctions in form, however, create different modes of proof. *Id.* at 789; 17 C.J.S. *Contracts, supra*, § 3 at 553.

Wilder contends that two express agreements governed his relationship with the Chamber: an oral contract of employment which was formed at the time Wilder accepted the position of executive director; and a written contract of employment, in the form of the memorandum of understanding, which may have governed the relationship between Wilder and the Chamber at the time of termination. Wilder challenges that disputed material facts regarding these agreements preclude summary judgment on this cause of action. We agree.

At the time the Chamber told Wilder to resign or be terminated, no cause was stated for termination. While cause may have existed to terminate Wilder, its role in the termination is not at issue. Wilder was terminated as an at will employee without cause. Also, we acknowledge that an employee who resigned after being told to resign or be terminated was terminated for purposes of a breach of contract action. *Kass v. Brown Boveri Corp.*, 199 N.J.Super. 42, 488 A.2d 242, 246–49 (1985) (holding action for breach of employment contract is not barred when resignation is a product of employer coercion); *Sheets v. Knight*, 308 Or. 220, 779 P.2d 1000, 1004–05 (1989) (recognizing that termination occurs when employer unconditionally orders employee to resign or be fired).

We begin our analysis by considering the oral contract of employment. The oral contract was formed when the Chamber offered employment to Wilder and he accepted. The consideration for this unilateral contract was supplied by Wilder when he performed his duties as an employee in the bargained for exchange. *Leithead v. American Colloid Co.*, 721 P.2d 1059, 1062–63 (Wyo.1986); *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880, 885 (1980); 1 Henry H. Perritt, Jr., *Employee Dismissal Law And Practice*, § 4.34 at 331 (3rd ed. 1992). *See Prudential Preferred Properties*, 859 P.2d at 1272 (adopting Restatement (Second) of Contracts § 71 (1981) rule that consideration is supplied by bargained for performance).

The status of Wilder's employment under the oral contract with the Chamber is in dispute. Wilder asserts that his employment was "permanent" for "as long as I did the work that was required." The Chamber contends that Wilder was employed "at will."

■ Wyoming continues to accept the common-law employment at will rule which states that either party may terminate a contract of employment, which is for an indefinite duration, at any time, for any reason or for no reason at all. *Lankford v. True Ranches, Inc.*, 822 P.2d 868, 872 (Wyo.1991); *Chasson v. Community Action of Laramie County, Inc.*, 768 P.2d 572, 575 n. 1 (Wyo. 1989); *Rompf v. John Q. Hammons Hotels, Inc.*, 685 P.2d 25, 27 (Wyo.1984). The employment at will rule creates a rebuttal presumption which affects only contracts of employment of indefinite .duration. *Leithead*, 721 P.2d at 1062; *Casper Nat. Bank*, 65 P.2d at 1120–21; *Toussaint*, 292 N.W.2d at 885– 92. While the employment at will rule is frequently criticized for its dubious historical origin, it continues to have application, with modifications, in present employer-employee relationships. *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1040–41 (Utah 1989).

The converse to the employment at will rule is that when a contract of employment states a definite duration, dismissal only for cause is presumed. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 628 (Minn.1983). However, this rule incorporates two restric-

tions. First, performance under a contract of definite duration is within the statute of frauds, Wyo.Stat. § 1–23–105 (1988), making evidence of a writing necessary if the terms are not performed within one year. *Toussaint,* 292 N.W.2d at 891 n. 24 (discussing applicability of statute of frauds to contracts of employment for a definite duration and inapplicability of statute of frauds to a contract of employment for an indefinite duration); Restatement (Second) of Contracts § 130, cmt. a (1981) (stating inapplicability of statute of frauds to contracts of uncertain duration). Second, employers and employees are free to enter into express contracts which state a duration but contain specific language preserving the right to terminate at will by either party. *Toussaint,* 292 N.W.2d at 890. An example of such a contract would be a three year agreement, in writing, identifying wages and benefits to be paid to the employee in return for performance of required duties, but specifically permitting either party to terminate the agreement at will.

■ Wilder does not assert that the oral contract of employment with the Chamber was for a definite duration. Instead, he argues his employment was "permanent." The word "permanent" as used in employment contracts is subject to multiple definitions. Under one standard, "permanent" employment is indefinite employment which continues until a party to the contract terminates the agreement with cause. *Leithead,* 721 P.2d at 1063; *Rompf,* 685 P.2d at 28 n. 2. However, "permanent" may also be used to refer to employment status, such as distinguishing between an employee on probation or hired temporarily and another who is considered "permanent." *Beales v. Hillhaven, Inc.,* 108 Nev. 96, 825 P.2d 212, 216 (1992). We hold that a claim by an employee that the employer promised "permanent" employment does not alter the at will presumption without additional consideration supplied by the employee or explicit language in the contract of employment stating that termination may only be for cause. *Leithead,* 721 P.2d at 1063 (holding language in handbook which contrasted "probationary" at will employee with "permanent" employee implied "permanent" employee could only be discharged for cause); *Pine River State Bank,* 333 N.W.2d

at 627 (holding without additional consideration supplied by the employee which is uncharacteristic of the employment relationship itself, "permanent" or "lifetime" employment is presumed at will); *Beales,* 825 P.2d at 216 (holding that status of "permanent" employee, standing alone, is insufficient to alter presumption of at will employment).

Wilder attempts to find additional consideration for "permanent" employment in the fact that he closed his real estate brokerage to accept the position with the Chamber. We agree that in some situations, such as giving up a competitive business as part of a promise not to compete, sufficient additional consideration may be present to create "permanent" employment subject to dismissal for cause. *Hartbarger v. SCA Services, Inc.,* 200 Ill.App.3d 1000, 146 Ill.Dec. 633, 641, 558 N.E.2d 596, 604, *appeal denied,* 135 Ill.2d 556, 151 Ill.Dec. 382, 564 N.E.2d 837 (1990). However, this court has held in *Rompf,* 685 P.2d at 28–29, that leaving a prior position to accept new employment, without more, is insufficient to create "permanent" employment.

Wilder claims that an additional explicit promise contained in the oral contract of employment was the promise by the Chamber to employee Wilder for "as long as I did the work that was required." The Chamber contends that Wilder's employment was at will and without an express promise making him subject to dismissal for cause.

■ Whether an oral contract exists, the terms and conditions of the oral contract and the intent of the parties are generally questions of fact. *Hartbarger,* 558 N.E.2d at 604. Only when the terms of an oral contract are shown without any conflict in the evidence does the interpretation become a question of law for the court. *Engle v. First Nat. Bank of Chugwater,* 590 P.2d 826, 830 (Wyo.1979).

We accept the proposition, inherent in Wilder's argument, that the parties may choose to provide that termination is for cause even in a contract of employment of indefinite duration. *Pine River State Bank,* 333 N.W.2d at 628. This proposition is present in employment handbook litigation, since no duration of employment is usually found in

the implied in fact contract. *See, e.g., McDonald II,* 820 P.2d at 991. However, the terms of the oral contract of employment purporting to provide that Wilder would be dismissed only for cause are sufficiently controverted to constitute disputed material facts.

The relevance of the oral contract of employment is that its terms were in effect at the time Wilder and the Chamber agreed to the memorandum of understanding. If, under the oral contract of employment, Wilder's employment could only be terminated for cause, a disputed material fact, then an issue of law exists whether there was sufficient consideration at the time of the execution of the memorandum of understanding to modify Wilder's employment to employment at will under the terms of the memorandum of understanding.

The traditional view recognizes that "a promise by an employer or an employee under a subsisting contract to do more or take less than that contract requires is invalid unless the other party gives or promises to give something capable of serving as consideration." 3 Richard A. Lord, *Williston on Contracts* § 7:37 at 605 (4th ed. 1992). *See Hopper,* 861 P.2d at 541 (adopting rule in Wyoming that separate consideration is required to enforce a covenant not to compete created after employment relationship is in existence). The Restatement (Second) of Contracts § 89 at 237 (1981) states the applicable rule:

> A promise modifying a duty under a contract not fully performed on either side is binding
>
> (a) if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made; or
>
> (b) to the extent provided by statute; or
>
> (c) to the extent that justice requires enforcement in view of material change of position in reliance on the promise.

The Restatement illustrates the operation of this rule with a hypothetical in which an employee is given a pay raise following a job offer from a competitor and a new contract of employment is written. *Id.* at 239, ill. 3. The consideration for the new contract is provided by the employee refusing the job offer from the competitor.

In executing the memorandum of understanding, the Chamber reduced portions of Wilder's compensation and stated he was an at will employee. The possible consideration the Chamber provided in return for Wilder's promise to take less was that Wilder would not be terminated until an audit of the Chamber's financial records was completed. We need not determine at this point if that consideration was adequate or whether other consideration exists. The parties will be able to litigate this question on remand.

The memorandum of understanding declared Wilder's employment was "probationary" and that he was "an at will employee," giving the Chamber the right to terminate at any time for any reason or for no reason at all. In the same paragraph, however, the Chamber promised: "Upon completion of the audit, and the opportunity to review it, the Board will evaluate your status and whether or not to offer you continued employment."

The language of the memorandum of understanding is ambiguous creating mixed questions of law and fact over the parties' intentions. If Wilder was an at will employee under either the oral contract of employment or after adequate consideration was supplied to create the memorandum of understanding, he was subject to termination, as the Chamber indicated, at any time, for any reason or for no reason at all. *Lankford,* 822 P.2d at 872. As an at will employee, the Chamber was free to terminate Wilder's employment, or conduct an audit without establishing a probationary status. Placing an employee on probation as part of a disciplinary procedure is inconsistent with the employment at will presumption. Stephen P. Pepe & Scott H. Dunham, *Avoiding and Defending Wrongful Discharge Claims,* § 2.21 at 49–50 (1993). Furthermore, the Chamber promised to perform the audit to determine the extent of financial problems "prior to a decision" regarding Wilder's future employment. Whether this language placed a condition on Wilder's at will status under terms of the memorandum of understanding is a question of intent. *Holmes v.*

*Union Oil Co. of California,* 114 Idaho 773, 760 P.2d 1189, 1194 (1988); *Stone v. Mission Bay Mortg. Co.,* 99 Nev. 802, 672 P.2d 629, 630 (1983).

We reverse summary judgment in favor of the Chamber on this cause of action. The evidence demonstrates, when viewed in the light most favorable to the party opposing summary judgment, that disputed material facts exist regarding the terms of the oral contract of employment and the intent of the parties in executing the memorandum of understanding.

### B. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The Restatement (Second) of Contracts § 205 at 99 (1981) recognizes an implied duty under every contract:

> § 205 Duty of Good Faith and Fair Dealing
>
> Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

Good faith means "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community **standards of decency, fairness or reasonableness.**" *Id.* at 100, cmt. a (emphasis added). *See Garner v. Hickman,* 709 P.2d 407, 411 (Wyo.1985) (referring to definition of "good faith" under Uniform Commercial Code as honesty in fact in the conduct of the transaction concerned).

Prior decisions of this court have addressed the implied covenant of good faith and fair dealing in the context of employment litigation. *See, e.g., Hatfield v. Rochelle Coal Co.,* 813 P.2d 1308, 1309–10 (Wyo.1991); *Nelson v. Crimson Enterprises, Inc.,* 777 P.2d 73, 76 n. 3 (Wyo.1989); *Reese v. Dow Chemical Co.,* 728 P.2d 1118, 1120–21 (Wyo.1986); *Leithead,* 721 P.2d at 1064; and *Rompf,* 685 P.2d at 27–28. The consistent theme of this line of cases has been that the court would "reserve a decision on the viability of this doctrine in this state until a proper case is before us." *Rompf,* 685 P.2d at 28.

During the period in which the "proper case" has been sought, litigants have continued to present claims under the implied covenant which have been rejected. Wilder, too, claims that the Chamber's actions breached the implied covenant because the Chamber terminated his employment after promising in the memorandum of understanding to conduct an audit. We believe continued delay in recognizing the application of the implied covenant to contracts of employment wastes judicial resources with needless review of varied precedents and creative argument. Therefore, we hold that all contracts of employment contain an implied covenant of good faith and fair dealing; however, the Chamber's actions do not constitute a breach of the implied covenant as applied to contracts of employment in Wyoming.

During the decade in which this court has considered the applicability of the implied covenant of good faith and fair dealing to contracts of employment, common law has recognized the role of the implied covenant in contracts of insurance. *Hatch v. State Farm Fire and Cas. Co.,* 842 P.2d 1089 (Wyo.1992); *Darlow v. Farmers Ins. Exchange,* 822 P.2d 820 (Wyo.1991); *McCullough v. Golden Rule Ins. Co.,* 789 P.2d 855 (Wyo.1990). In *McCullough,* this court permitted recovery, in tort, for breach of the implied covenant based upon the special relationship created by the unequal bargaining power that an insurer has over an insured. *McCullough,* 789 P.2d at 858. A similar special relationship may be present between an employer-employee which permits recovery in tort for egregious conduct.

In other jurisdictions, the implied covenant has been applied to all types of contracts of employment. 1 Perritt, *supra,* § 4.26 (collecting cases). "Good faith and fair dealing between parties are pervasive requirements in our law; it can be said fairly, that parties to contracts or commercial transactions are bound by this standard." *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251, 1256 (1977). In *Fortune,* the Supreme Judicial Court of Massachusetts held the implied covenant governed relations between an employer and a commission

salesperson under a written contract of employment. *Id.* at 1255–56. The court found that the employer's actions in terminating the employee after twenty-five years of service to avoid paying a bonus for a just completed $5,000,000.00 sale constituted a breach of the implied covenant. *Id.* at 1258. The Supreme Court of New Hampshire has determined that the implied covenant governed relations between an employer and employee under all contracts of employment, including those that are at will or for a definite term. *Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549, 551 (1974). In *Monge,* the court held that terminating an employee hired under an oral at will contract of employment for refusing to date a supervisor constituted a breach of the implied covenant. *Id.* at 552. In *Kerr v. Rose,* 216 Cal.App.3d 1551, 265 Cal.Rptr. 597, 603 (1990), the court determined that the implied covenant applied to implied in fact contracts under a written termination and layoff policy. A fundamental limitation of the implied covenant is that it can not create duties that supersede express provisions of written contracts. *Farris v. Hutchinson,* 254 Mont. 334, 838 P.2d 374, 377 (1992).

The application of the implied covenant of good faith and fair dealing to contracts of employment has been not universally accepted. *See, e.g., Parnar v. Americana Hotels, Inc.,* 65 Haw. 370, 652 P.2d 625, 629 (1982) and *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081, 1086 (1984). The *Thompson* court called the concept of bad faith "amorphous." *Thompson* 685 P.2d at 1086. When viewed too broadly, we agree the implied covenant can be misapplied.

■■■ The Supreme Court of Arizona correctly summarized that the implied covenant "does not create a duty for the employer to terminate the employee only for good cause." *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 710 P.2d 1025, 1040 (1985) (adopting implied covenant to protect employee from termination to avoid payment of benefits already earned). *Accord Metcalf v. Intermountain Gas Co.,* 116 Idaho 622, 778 P.2d 744, 750 (1989), *modified sub nom., Sorensen v. Comm Tek, Inc.,* 118 Idaho 664, 799 P.2d 70, 75 (1990). For example, we do not consider it appropriate to read into the implied covenant language mandating that every termination must be for a "fair and honest reason." *Coombs v. Gamer Shoe Co.,* 239 Mont. 20, 778 P.2d 885, 887 (1989). However, we conclude that the implied covenant, with appropriate limitations, serves to balance the inherently unequal relationship between an employer and an employee. *See McCullough,* 789 P.2d at 858.

■■■ We hold that recovery of damages is permitted for tortious conduct which arises out of a contractual relationship of employment in breach of the implied covenant of good faith and fair dealing. *D'Angelo v. Gardner,* 107 Nev. 704, 819 P.2d 206, 215 (1991).

A tort, however, requires the presence of a duty created by law, not merely a duty created by contract; and, although a duty of good faith and fair dealing is created by law in all cases, it is only in *rare and exceptional* cases that the duty is of such a nature as to give rise to tort liability. The kind of breach of duty that brings into play the bad faith tort arises only when there are *special relationships* between the tort-victim and the tort-feasor * * *.

*K Mart Corp. v. Ponsock,* 103 Nev. 39, 732 P.2d 1364, 1370 (1987) (emphasis added). The special relationship necessary to permit recovery is not established merely by the employer-employee relationship. A showing is required that a special relationship of trust and reliance exists between the particular employee seeking recovery and the employer. *Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722, 729 (1980); *K Mart Corp.,* 732 P.2d at 1372. Trust and reliance may be found by the existence of separate consideration, common law, statutory rights, or rights accruing with longevity of service. *Cleary,* 168 Cal.Rptr. at 729.

Two Nevada cases illustrate the necessary showing of trust and reliance. In *K Mart Corp.,* the employee worked under an implied in fact contract of employment that made him subject to dismissal only for cause. *K Mart Corp.,* 732 P.2d at 1366. Six months before his retirement benefits vested, the employee was terminated for a minor violation of company policy. The court held the

employer breached the implied covenant of good faith and fair dealing by terminating the employee with the improper motive of denying contractually earned retirement benefits. *Id.* at 1370. *But see Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (holding that ERISA preempts state law wrongful discharge claim based on termination to avoid pension fund payments). In *K Mart Corp.,* 732 P.2d at 1372, the employee was "specially relying" on the employer's commitment to extended employment and retirement benefits for which he had remained with the company for nine and one-half years. By contrast, in *D'Angelo,* the employee, despite having "permanent" status under an implied in fact contract, could not show a breach of the implied covenant where he had been employed for less than two years and a special relationship had not "ripened." *D'Angelo,* 819 P.2d at 215.

■ When a special relationship of trust and reliance is demonstrated, a breach of the implied covenant is actionable as a tort. *McCullough,* 789 P.2d at 861. Therefore, compensatory damages are available to hold employers accountable for a breach of the implied covenant. *K Mart Corp.,* 732 P.2d at 1372. We adhere to the mandates of Wyoming law that punitive damages will only be awarded upon a showing of willful or wanton misconduct. *McCullough,* 789 P.2d at 861.

The Chamber's conduct in terminating Wilder did not breach the implied covenant of good faith and fair dealing as a matter of law. Initially, we do not find sufficient longevity in Wilder's three years of employment with the Chamber or other bases to establish a special relationship. Fundamentally, we find no evidence that termination occurred as a means to avoid payment of benefits already earned under the contract of employment. *Wagenseller,* 710 P.2d at 1040; *Metcalf,* 778 P.2d at 749; *Fortune,* 364 N.E.2d at 1258; *K Mart Corp.,* 732 P.2d at 1370.

We affirm summary judgment in favor of the Chamber on this cause of action.

### C. NEGLIGENCE

■ Wilder next claims Chamber officials acted negligently in terminating his employ-ment prior to completion of the audit. Specifically, Wilder alleges that a duty of reasonable care was breached by the failure to properly investigate the financial problems at the Chamber. The only support for Wilder's position is the Supreme Court of Montana's decision in *Crenshaw v. Bozeman Deaconess Hosp.,* 213 Mont. 488, 693 P.2d 487, 493 (1984). *Crenshaw* held that a negligence cause of action was stated by the employer's failure to properly investigate allegations of impropriety before terminating the employee for cause. *Id.*

■ We are persuaded that no tort cause of action exists for negligent investigation in employment relationships. As we have previously stated, employment creates a contractual relationship. If that contract is breached, relief lies with an action for breach of contract. "To the extent an employee has an employment contract requiring specific reasons for dismissal, then the employer must conduct an adequate investigation or be liable for breach of that contract." *Lambert v. Morehouse,* 68 Wash.App. 500, 843 P.2d 1116, 1119 (1993) (declining to recognize cause of action for negligent investigation in employee termination). *See Morris v. Hartford Courant Co.,* 200 Conn. 676, 513 A.2d 66, 68 (1986).

Furthermore, *Crenshaw* does not support a cause of action for negligent investigation under the present facts. In *Heltborg v. Modern Machinery,* 244 Mont. 24, 795 P.2d 954, 961 (1990), the court held a termination decision for economic reasons did not state a tort cause of action because an employer is not under a duty to use reasonable care in all decision making. We read *Heltborg* as limiting *Crenshaw* by stating that the employer's duty to use reasonable care is restricted to situations involving negligent investigation of a for cause termination. Wilder was not dismissed for cause. It is undisputed that the Chamber dismissed Wilder as an at will employee, despite the investigation into financial problems that was being conducted.

We affirm summary judgment in favor of the Chamber on this cause of action.

## D. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In *Leithead*, 721 P.2d at 1064–68, this court recognized a cause of action in Wyoming for intentional infliction of emotional distress. As adopted, damages may be recovered in tort for intentionally or recklessly extreme and outrageous conduct which causes severe emotional distress. *Id. See* Restatement (Second) of Torts § 46(1) (1965). Outrageous conduct is defined as conduct "which goes beyond all possible bounds of decency, is regarded as atrocious, and is utterly intolerable in a civilized community." *Leithead*, 721 P.2d at 1066 (*citing* Restatement (Second) of Torts, *supra*, § 46, cmt. d). Recovery is permitted when emotional distress, which includes reactions such as shame, humiliation, embarrassment and worry, is extreme. *Leithead*, 721 P.2d at 1066–67.

Wilder claims that the Chamber's actions constituted intentional infliction of emotional distress. Wilder declares that the Chamber sought to make him publicly responsible for the financial problems as a "scapegoat" prior to and at the time of termination. As a result, he suffered shame and public humiliation. Further, Wilder contends that after his termination, the Chamber's intentionally tortious conduct continued. When the Chamber received the audit report, Wilder asserts that Chamber officials failed to disclose that there was no misconduct on his part, but instead made statements in the press regarding a continuing investigation in the form of "fraud tests" causing additional humiliation. Later, Wilder maintains Chamber officials acted outrageously in repeatedly seeking to prevent Wilder from obtaining employment. As a result, Wilder alleges he suffered severe emotional distress over a lengthy period following his termination.

The court determines, as a question of law, whether the conduct of the tortfeasor " 'may reasonably be regarded as so extreme and outrageous to permit recovery, or whether it is necessarily so.' " *Leithead*, 721 P.2d at 1066 (*quoting* Restatement (Second) of Torts, *supra*, § 46, cmt. h); *Hogan v. Forsyth Country Club Co.*, 79 N.C.App. 483, 340 S.E.2d 116, 121 (1986). Once conduct is shown which may be reasonably regarded as extreme and outrageous, the jury must determine, with proper instruction, " 'whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.' " *Leithead*, 721 P.2d at 1066 (*quoting* Restatement (Second) of Torts, *supra*, § 46, cmt. h). *See Hogan*, 340 S.E.2d at 121.

We must consider the allegations of outrageous conduct from two points in time: conduct prior to and at the time of termination; and conduct following termination. In *Leithead*, this court recognized that if the employee's emotional distress is caused solely by termination and termination is permitted under terms of the contract of employment, no recovery is permitted for intentional infliction of emotional distress. *Leithead*, 721 P.2d at 1066. "The ordinary person who is fired from his job might worry about his future and his ability to pay his bills. He might also lose sleep over it. But this is the kind of distress with which the ordinary person must be expected to cope." *Id.* at 1067.

Sufficient evidence exists of outrageous conduct by the Chamber prior to and at the time of termination. Chamber officials at the March 29, 1989 meeting placed Wilder on probation, reduced his compensation, possibly altered his employment status and required him to publicly address a community group to "accept the responsibility" for the financial problems. These harsh actions were taken prior to the completion of any formal investigation and despite Wilder's denial of any prior knowledge or responsibility for the financial problems. Shortly after Wilder's public address, the Chamber terminated his employment without fulfilling the promise to conduct an audit contained in the memorandum of understanding. Viewing the evidence in the light most favorable to Wilder as the party opposing summary judgment, the Chamber's actions may reasonably be regarded as outrageous. *See Havens v. Tomball Community Hosp.*, 793 S.W.2d 690, 691 (Tex.App.1990) (holding employer's course of conduct in seeking to humiliate and degrade employee's good name prior to termination stated a cause of action for intentional infliction of emotional distress) and

*Retherford v. AT & T Communications of Mountain States, Inc.,* 844 P.2d 949, 978 (Utah 1992) (holding co-employees' course of conduct in retaliation for good faith sexual harassment complaint stated a cause of action for intentional infliction of emotional distress).

Sufficient evidence is also present of outrageous conduct by the Chamber following termination. The Chamber aggressively sought to prevent Wilder from obtaining employment following his termination on at least two occasions. Chamber officials publicly objected to Wilder's possible employment with the Park County Travel Council and offered the services of a Chamber employee to perform the desired work. These actions were repeated when Wilder attempted to secure employment with the Yellowstone Airport Board. There is no record of whether the Chamber was compensated for the work. No reasonable person expects a former employer to mount an active campaign to prevent a former employee from obtaining work. Giving Wilder the benefit of every reasonable doubt and inference, this conduct may reasonably be regarded as outrageous. *See M.B.M. Co., Inc. v. Counce,* 268 Ark. 269, 596 S.W.2d 681, 688 (1980) (holding former employer's course of conduct following termination stated a cause of action for intentional infliction of emotional distress).

■ We do not find outrageous conduct in the Chamber's release of the audit report. The audit report was presented to the Chamber after Wilder was terminated. It disclosed intentional errors or omissions which created inaccurate financial records. The Chamber announced this conclusion and revealed that further "fraud tests" of the financial records would be conducted. These actions, under the circumstances, were reasonable as a matter of law.

The Chamber maintains, despite the nature of the conduct, that Wilder has not suffered severe emotional distress. We disagree. " 'The intensity and the duration of the distress are factors to be considered in determining its severity.' " *Leithead,* 721 P.2d at 1067 (*quoting* Restatement (Second) of Torts, *supra,* § 46, cmt. j). The shame and public humiliation which Wilder alleges

he suffered extended over a period of two years. This duration is sufficient to create a jury question on the issue of liability. As we announced in *Leithead,* 721 P.2d at 1067 (*quoting* Restatement (Second) of Torts § 46, *supra,* cmt. j), " '[i]t is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.' "

Summary judgment in favor of the Chamber on this cause of action is reversed.

#### E. DEFAMATION

■ "A defamatory communication is one which tends to hold the plaintiff up to hatred, contempt, ridicule or scorn or which causes him to be shunned or avoided; one that tends to injure his reputation as to diminish the esteem, respect, goodwill or confidence in which he is held." *Tschirgi v. Lander Wyoming State Journal,* 706 P.2d 1116, 1119 (Wyo.1985). *Accord Century Ready–Mix Co. v. Campbell County School Dist.,* 816 P.2d 795, 799 (Wyo.1991).

Wilder alleges that defamatory statements were made about him by a Chamber officer and an employee at a travel industry conference in Denver in May of 1991. The statements were published to a security guard who was told by the Chamber official and employee not to admit Wilder because he was no longer a Chamber employee and might "steal" their work. Specifically, a Chamber employee said Wilder was "sneaky," "lazy," "good-for-nothing," and a "son-of-a-bitch." The Chamber official told the guard Wilder "got fired" and should not be admitted to the conference.

The tenor of the language quoted and other language allegedly used by the Chamber official and employee is disparaging and offensive, but is not actionable as defamation. "Disparaging words, to be actionable per se * * * must affect the plaintiff in some way that is peculiarly harmful to one engaged in his trade or profession." Restatement (Second) of Torts § 573 at 194, cmt. e. (1977). None of the comments to the security guard meet this standard.

Summary judgment in favor of the Chamber on this cause of action is affirmed.

### F. INTENTIONAL INTERFERENCE WITH A PROSPECTIVE CONTRACTUAL RELATIONSHIP

 Wyoming recognizes the tort of intentional interference with a prospective contractual relationship. *Four Nines Gold, Inc. v. 71 Const., Inc.,* 809 P.2d 236, 238 (Wyo.1991); *Martin v. Wing,* 667 P.2d 1159, 1162 (Wyo.1983).

"One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation."

*Four Nines Gold, Inc.,* 809 P.2d at 238 (*quoting* Restatement (Second) of Torts § 766B (1979)). To be actionable as intentional interference with prospective contractual relations, the claimed interference must be improper, although malice need not be shown. *Four Nines Gold, Inc.,* 809 P.2d at 238. Therefore, truthful statements, solicited or volunteered, are not actionable and interference is permitted when the actor acts in good faith to protect an economic interest. *Id.*

Wilder contends that the Chamber intentionally interfered with prospective contractual relations by repeatedly attempting to block his employment and by attempting to exclude him from the travel industry conference in Denver in May of 1991. The Chamber maintains these actions were competitive but not improper.

Restatement (Second) of Torts § 768 (1979), in pertinent part, recognizes that legitimate competition does not result in intentional interference with prospective contractual relations:

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

The Restatement authors note that as long as some competitive interest is served, the fact that a competitor may also be directed by a desire for revenge or other improper motive is not sufficient, alone, to create improper interference. *Id.* at 43, cmt. g.

The Chamber's actions do not constitute intentional interference with prospective contractual relations as a matter of law. The Chamber acted as a competitor. When Wilder sought employment from the Park County Travel Council and the Yellowstone Airport Board, the Chamber sought potential economic gain for itself by offering to perform the work Wilder desired. As a competitor at the travel industry conference, the Chamber also acted to protect its business interests, although admittedly not in a businesslike manner. While the Chamber's motives may be suspect, as a non-profit corporation engaged in travel promotion, the Chamber had a right to compete with Wilder in this business.

Summary judgment in favor of the Chamber on this cause of action is affirmed.

### G. PROCEDURAL ISSUES

 Wilder contends that the district court abused its discretion in denying a motion for leave to amend the complaint. The motion to amend was filed at the completion of discovery. The district court denied the motion finding that Wilder had not acted in a timely manner and granted summary judgment in favor of the Chamber.

 This court has adopted the view that leave to amend a complaint "should be

freely granted when the amendment will serve a good purpose and when it will not unduly prejudice the defendant." *Herrig v. Herrig,* 844 P.2d 487, 490 (Wyo.1992); W.R.C.P. 15. The denial of a motion to amend is only reversed when an abuse of discretion is found. *Herrig,* 844 P.2d at 490. Abuse of discretion implies the court has acted in a manner that exceeds the bounds of reason under the circumstances. *Boller v. Key Bank of Wyoming,* 829 P.2d 260, 266 (Wyo.1992) (*quoting Martinez v. State,* 611 P.2d 831, 838 (Wyo.1980)).

Wilder sought leave of the district court to amend his complaint to add three additional causes of action against the Chamber and to state causes of action against several individual defendants. At oral argument, Wilder admitted that separate proceedings have been filed against the individual defendants he sought to make a party to this action. Therefore, we need only consider whether an abuse of discretion occurred in denying leave to state the additional causes of action.

Wilder's motion to amend and the Chamber's motion for summary judgment were presented together to the district court during a combined hearing. The applicable rule permits the district court to consider the motion for summary judgment as being addressed to the complaint in the form in which it is sought to be amended.

> If plaintiff's claim, even with the complaint amended, still is vulnerable to a summary judgment, the court need not formally decide the motion to amend. As a result, the denial of leave to amend a pleading in such a case, even if technically erroneous, is not prejudicial if the amendment would not have affected the decision to grant summary judgment against plaintiff. Conversely, if an amendment would change the result on the motion, it should be permitted and summary judgment denied.

10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure; Civil 2d* § 2722 at 47–48 (1983) (footnotes omitted).

The record discloses that the additional causes of action which Wilder sought against the Chamber were not addressed in considering the motion for summary judgment.

Therefore, we hold the district court abused its discretion by not considering what effect, if any, Wilder's claims of promissory estoppel, fraud and negligent misrepresentation against the Chamber may have had on the motion for summary judgment. We acknowledge the view expressed by the district court that Wilder has fired a shotgun at the lake in hopes of hitting a mallard. Despite the numerous causes of action presented by Wilder, judicial economy has not been served by forcing two proceedings against different parties each with substantially similar claims and witnesses.

■ The Chamber contends that an affidavit from Wilder's counsel included in the record on appeal should not be considered. The affidavit states that exhibits attached to it are true and correct copies of the original documents. Some of those documents were apparently used as exhibits during depositions; however, no exhibits were attached to the portions of the depositions designated for the record on appeal. We need not address this issue because the Chamber offered no objection, in the form of a motion to strike the affidavit, at the district court level. Therefore, we consider any objection as having been waived. *Conway v. Guernsey Cable TV,* 713 P.2d 786, 788 (Wyo.1986). *See* 10A Wright, Miller & Kane, *supra,* § 2722 at 60–61.

Finally, we address a procedural issue under W.R.A.P. 7.04. This court permits citation at oral argument of any "relevant authority published since the filing of a party's brief, or other authority which was not discovered until after the brief was served * * *" so long as notice is provided to the court and opposing counsel "five days prior to argument." W.R.A.P. 7.04. The Chamber filed a notice of additional authority on Friday, September 17, 1993. The notice stated an intent to cite five additional cases, all published several years ago, at oral argument supporting termination of an employee while on probation. Oral argument for this case occurred on Tuesday, September 21,

1993. The Chamber's notice was untimely and the cases cited were not considered. W.R.A.P. 7.04; W.R.C.P. 6(a).

## IV. CONCLUSION

Lessons in the employer-employee relationship are not easily learned. The common law attempts to preserve a careful balance premised on employment at will. However, when the facts of a particular employer-employee relationship support modifications in the at will relationship, additional care must be exercised to insure compliance with those modified terms of employment. In this instance, disputed material facts over the nature of the relationship and the conduct of the parties preclude summary judgment on certain causes of action.

We reverse and remand the summary judgment granted in favor of the Chamber on the cause of action for breach of contract.

We reverse and remand the summary judgment granted in favor of the Chamber in the cause of action for intentional infliction of emotional distress.

We affirm the summary judgment granted in favor of the Chamber on the cause of action for breach of the implied covenant of good faith and fair dealing.

We affirm the summary judgment granted in favor of the Chamber on the cause of action for negligence.

We affirm the summary judgment granted in favor of the Chamber on the cause of action for defamation.

We affirm the summary judgment granted in favor of the Chamber on the cause of action for intentional interference with a prospective contractual relationship.

We hold that the district court abused its discretion in denying the motion for leave to amend the complaint.

We hold any objection to a challenged affidavit was waived.

We hold that the notice of additional authority filed by the Chamber was untimely.

Therefore, the decision of the district court is affirmed in part, reversed in part and remanded for further proceedings in accord with this opinion.

MACY, Chief Justice, concurring in part and dissenting in part, with whom CARDINE, Justice, joins.

I dissent from that portion of the majority opinion in which the Court affirms the district court's grant of a summary judgment on Wilder's defamation claim.

Wilder pleaded defamation with an adequate degree of specificity, including special damages to his professional reputation. A fact finder might conclude that the alleged defamatory language, i.e., that Wilder might "steal" work and that he was "sneaky," "lazy," "good-for-nothing," and a "son-of-a-bitch," was peculiarly harmful to a person engaged in Wilder's profession, especially given the setting and the circumstances in which the words were uttered. The recitation of RESTATEMENT (SECOND) OF TORTS § 573 cmt. e (1977) in the majority opinion is sound as far as it goes. However, numerous other sections in that chapter of the RESTATEMENT are also applicable here. *See generally* §§ 558 to 581A. When all the chapters are considered in the light of this case, many others temper the apparent harshness of § 573.

I have noted on at least two occasions that members of society must cope with life's indignities and failures. *Osborn v. Emporium Videos*, 848 P.2d 237, 242 (Wyo.1993) (Macy, C.J., dissenting); *Skane v. Star Valley Ranch Association*, 826 P.2d 266, 270 (Wyo.1992). What occurred in this instance is not one of those indignities which an individual should be required to absorb without redress. The context in which these statements were made is as important as any other factor in this case. These statements were made at a trade association meeting where persons in Wilder's profession may do their "networking," seek advancements in their profession, and tout their skills and accomplishments. Indeed, the record demonstrates that Wilder was involved in a fight to salvage his professional life. I cannot

disagree that some of the epithets used in this case, including "son-of-a-bitch," might be considered as being mere disparagement—or a statement of opinion—in some contexts, but this was not office gossip or banter or a social situation where such language might pass as "loose talk." *See Rambo v. Cohen*, 587 N.E.2d 140 (Ind.Ct.App.1992); *Petula v. Mellody*, 138 Pa.Cmwlth. 411, 588 A.2d 103 (1991); *Lee v. Metropolitan Airport Commission*, 428 N.W.2d 815 (Minn.Ct.App. 1988); PAUL ALEXANDER & VANESSA WELLS, EMPLOYEE, BUSINESS & PROFESSIONAL DEFAMATION § 7.02 (1991); C.C. Marvel, Annotation, *Libel and Slander: Actionability of Charge of Being a "Slut," "Bitch," or "Son of a Bitch,"* 13 A.L.R.3d 1286 (1967); R.P. Davis, Annotation, *Libel and Slander: Charge of Being a "Crook,"* 1 A.L.R.3d 844 (1965); and Jonathan M. Purver, *Liability for Abusive Language*, 16 P.O.F.2d 493 (1978).

Given the circumstances present in this case, I would also reverse the summary judgment as to the defamation issue and remand that matter for further proceedings as well.

GOLDEN, Justice, concurring in part and dissenting in part.

I concur in those parts of the majority opinion which address the negligence, defamation, intentional interference with prospective business relations, and procedural issues. I dissent, however, to those parts of the majority opinion which address the breach of contract, the implied covenant of good faith and fair dealing, and outrageous conduct issues.

About the breach of contract issue, in my judgment Mr. Wilder's employment at all times was as an at-will employee. When the Chamber hired him in 1986, there was no written employment agreement. The sum and substance of the chamber's hiring of him is revealed in Mr. Wilder's deposition testimony. Four Chamber representatives—Joe Bush, Bill Weiss, Tom Cook and Doug Weedin—interviewed him for the executive director position. Questioned by the Chamber's lawyer at his deposition about his job interview, Mr. Wilder testified as follows:

Q. What were you told at the time you were hired as far as the term or length of your employment? Anything?

A. Well, I expected to be permanently employed.

Q. What were you told as far as the term or the length of your employment?

A. I was told that I would be employed for as long as I did the work.

A. And that's your best recollection as far as the words that were used to describe your length or term of employment?

A. I was told * * * that they thought I should be there for a long time, as long as I did the work that was required.

Q. Was it your understanding that your employment was at will between the time you were hired in 1986 and March 31st, 1989?

A. No.

Q. What was your understanding as to what your agreement was with the board during that period of time, as far as your employment?

A. It was that I was a permanent employee; that I was there permanently employed; that I expected to be permanently employed; and that at an annual review, I was promised an employment contract.

\* \* \* \* \* \*

Q. Someone from the board promised you a written contract, is that right?

A. Well, at one of the annual reviews, I brought it up. And we discussed that I would be an employee with [a written] employment contract * * *.

\* \* \* \* \* \*

Q. What steps were undertaken from that point forward by either you or the board to prepare such a written contract?

A. You know * * * it wasn't for me to prepare it. And I left it to them, and I just didn't hear back.

Q. Did you ever get back to any of the board members about that written contract?

A. Not that I recall.

Q. Your understanding at the time you were hired was that you were verbally told that so long as you continued to do your duties as executive director in a satisfactory manner, you would continue to be employed?

A. That's correct.

Q. [Were] there any other discussions or [was there] any other agreement that you recall as far as how long you would be employed with the Chamber?

A. I can only assume. Well, assumptions don't matter.

Q. Do you recall there being any other conversations about the length or the term of your employment?

A. No.

This court has made it clear in our wrongful discharge cases that the employee's "[s]ubjective understandings and expectations do not establish an employment contract with a definite term of duration." *Allen v. Safeway Stores, Inc.*, 699 P.2d 277, 282 (Wyo.1985). Thus, if the employment is for an indefinite term, as Mr. Wilder's clearly was, it is terminable at will by either party. *Allen*, at 281–82. Based upon Mr. Wilder's own testimony describing his interview and hiring, I conclude no genuine issue of material fact exists about the nature of his employment status. As a matter of law, his status was at will.

Mr. Wilder next asserts that, in any event, the letter agreement dated March 31, 1989, changed the status of his employment. He concedes that by the letter's language his employment was at will except as to the financial problem; he contends that with respect to that problem his status was "discharge for cause." I do not agree. From my reading of the letter I conclude that the Chamber unambiguously expressly states that Mr. Wilder's status is at will. In the pertinent second paragraph of the letter, the Chamber states:

Your status is probationary through July 1, 1989, or upon completion of an audit of the Chamber books, which may be completed sooner than July 1, 1989. Upon completion of the audit, and the opportunity to review it, the Board will evaluate your status and whether or not to offer you continued employment. The board reserves the right to consider past employment performance, and review will not be limited to your performance during the probationary period. The Board believes that the entire financial and management picture of Chamber operations should be before them prior to a decision regarding your future employment. In other words, the Board wants all the facts before them, and as such the probationary period is in no way to operate as a waiver of the Board's right to consider performance prior to the probationary period. You are an at will employee, and the Board has the right to terminate at any time for any reason, or for no reason at all. However, we insist on knowing all the facts before any action is taken. Again, you serve at the pleasure of the Board.

In my judgment, the sum and substance of the Chamber's statement to Mr. Wilder is this:

Although we are going to audit the books and review that audit and although we are going to review your past performance as well as your future performance so that we have all the facts, "[y]ou are an at will employee, and [we have] the right to terminate at any time for any reason, or for no reason at all * * *. Again, you serve at the pleasure of the Board."

The letter simply does not contain any language that the Chamber has created a "discharge for cause" exception on the financial item. I see no ambiguity about this language. I would hold, as a matter of law, Mr. Wilder's employment was at will.

Concerning the majority's treatment of the issue of the implied covenant of good faith and fair dealing, I have several areas of disagreement. First, given the form of the covenant as presented by Mr. Wilder and the manner in which Mr. Wilder presented this issue, and given the manner in which the majority has resolved the breach of contract issue, I see no need for the majority to decide the implied covenant issue as presented by Mr. Wilder. Second, I disagree with the majority's recognition, however qualified,

of a tort cause of action for the breach of the implied covenant. I shall explain these several disagreements.

Because the majority reverses the summary judgment on the breach of contract issue, I see no need for the majority to decide the implied covenant issue. In Mr. Wilder's complaint, in addition to alleging, as contract actions, a breach of an employment agreement and the March 31, 1989 agreement, he also alleged, as a tort action, the breach of an implied covenant of good faith and fair dealing. In Mr. Wilder's memorandum in opposition to the Chamber's motion for summary judgment, he explained the nature and extent of this implied covenant claim he was advancing. He predicated this claim only on the March 31, 1989 letter agreement, not on his employment status for the earlier three-year period. As to the March 31 letter agreement, he asserted that if the court construed that agreement to mean his employment status was at will, then this was the right case in which the court should recognize the covenant. His reasoning was that the Chamber, in that agreement, promised him it would take no action on his employment until the investigation and audit of the books were completed; he relied on that promise; the Chamber broke that promise; therefore, the Chamber did not act in good faith, *i.e.*, "honesty in fact in the conduct [of the] transaction concerned." *Garner v. Hickman*, 709 P.2d 407, 411 (Wyo. 1985). He argued that a question of fact existed whether the Chamber met that standard of conduct.

In his appellate brief Mr. Wilder expressly states that if this court accepts his construction of the March 31, 1989 letter agreement, that his employment status was "discharge for cause" as to the financial problem, then "it will not be necessary for the Court to consider [the implied covenant] claim." After setting forth his "implied covenant" argument for consideration in the event the court finds that his status under that letter agreement is only at will, he concludes by stating

"summary judgment on Mr. Wilder's [implied covenant] claim should be reversed *if* this court does not reverse the judgment on the breach of contract claim." (Emphasis added).

In my judgment, Mr. Wilder conditionally presented a narrowly drawn implied covenant tort claim. It was narrowly drawn since it was predicated only on a perceived promise contained in the written March 31, 1989 letter agreement; it was presented conditionally since its consideration was explicitly premised on this court's affirmance of the summary judgment on the contract action for breach of contract. This court's majority opinion, however, does not affirm the summary judgment on the contract action—it reverses it; therefore, it is premature and unnecessary to decide at this time the narrowly drawn implied covenant tort claim.

Be that as it may, the majority has treated the implied covenant question, but not in the narrowly drawn form in which Mr. Wilder conditionally presented it. Because the majority does not treat the implied covenant question in the form in which Mr. Wilder presented it, the majority works in a vacuum: there are no facts which frame the form of the implied covenant question which the majority chooses to treat and there are no advocates on either side of the question being treated. Such a sterile environment is not conducive to good appellate decision-making.

I disagree with both the majority's treatment of the implied covenant question and the results of that treatment, *viz.*, recognition of a tort of breach of an implied covenant of good faith and fair dealing. Having carefully reviewed this court's wrongful discharge jurisprudence, I have concluded that this court previously expressly rejected the implied covenant concept. In *Rompf v. John Q. Hammons Hotel, Inc.*, 685 P.2d 25 (Wyo. 1984), this court affirmed the district court's summary judgment against the motel's recently hired at-will chief engineer who in his complaint had alleged, among other theories, a breach of the implied covenant, inherent in every contract, by terminating him instead of employees under his supervision hired more recently than he. *Rompf*, 685 P.2d at 27–28. Conceding that his employer reduced staff because of budgetary constraints, Mr. Rompf asserted that concepts of good faith required

his employer to retain him rather than those employees subordinate to him. *Id.* Although this court expressly reserved a decision on the implied covenant's viability in Wyoming "until a proper case is before us," this court held that the evidence failed to show a violation of the good-faith duty imposed upon employment relationships in other jurisdictions. *Rompf,* 685 P.2d at 28.

In *Leithead v. American Colloid Co.,* 721 P.2d 1059, 1064 (Wyo.1986), this court reversed the district court's summary judgment against the discharged employee, holding as a matter of law that the employee handbook changed the employee's at-will status to "discharge for cause only" status. Importantly, the majority treated the employee's claim which alleged the employer's breach of the implied covenant. Said the majority:

> In some jurisdictions, an implied covenant of good faith is imposed on employers when they discharge employees under a contract at will. The covenant has no application here, however, because the parties' contract was not at will.

*Leithead,* 721 P.2d at 1064 (citations omitted).

By using this explanation, the court was recognizing that historically courts had seen the implied covenant theory advanced by discharged at-will employees trying to create an exception to the widely followed at-will doctrine. The court was also expressly holding that the implied covenant theory does not apply in employment relationships which require just cause for discharge. In Leithead's case, the employer's use of the handbook had created a "discharge for just cause" employment status; therefore, the implied covenant theory was not applicable.

The question whether this court would recognize the implied covenant in an at-will employment was partially answered in *Leonard v. Converse County Sch. Dist. No. 2,* 788 P.2d 1119 (Wyo.1990). This court expressly held that neither the implied covenant theory nor the public policy tort theory apply to an initial contract teacher's employment. *Leonard,* 788 P.2d at 1122. In my view, this court

expanded that partial answer to a complete answer in *Ware v. Converse County Sch. Dist. No. 2,* 789 P.2d 872 (Wyo.1990), by holding that the implied covenant theory does not apply to a discharged school custodian who was an at-will employee of the school district. *Id.* at 875. This court's rejection of the implied covenant theory was reaffirmed in *Hatfield v. Rochelle Coal Co.,* 813 P.2d 1308 (Wyo.1991), by answering certified questions from the federal district court.

Despite this court's clear authority, the majority today reverses direction and holds, without sufficient consideration and analysis in my judgment, that we now recognize a tort action available against every type of Wyoming employer for breach by tortious "egregious conduct" of the implied covenant if a "special relationship of trust and reliance exists between the particular employee seeking recovery and the employer." The majority uncritically relies in large part upon *Cleary v. Am. Airlines, Inc.,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (Ct.App. 2 Dist. (1980) in support of this new tort action. The California Supreme Court, however, expressly rejected this particular feature of *Cleary* five years ago in *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988). More about *Foley* shortly.

The majority also appears to rely on two Nevada cases as support for recognition of this new tort theory. In the first case, the employee was a tenured, not an at-will, employee. *K–Mart Corp. v. Ponsock,* 103 Nev. 39, 732 P.2d 1364, 1365, 1366, 1368 (1987). He had been hired for a definite term, *viz.,* until retirement. In its employee handbook, K–Mart had agreed that Ponsock could be terminated only for cause; if his performance were deficient, K–Mart would assist him and would terminate him only after giving him a series of correction notices and a determination that his performance remained unacceptable. *K–Mart,* at 1366. K–Mart discharged him without following these handbook provisions. *Id.* At the time, Ponsock was about six months shy from 100 percent vesting of his retirement benefits which were to be fully paid by K–Mart. *Id.* Based upon these facts, the Nevada court recognized "a bad

faith discharge case in this fact-specific instance of discharge by a large, nationwide employer of an employee in bad faith for the improper motive of defeating contractual retirement benefits." *Id.* at 1370. In its analysis, the Nevada court seizes upon the "special relationship' notion recognized in the insurance contract context and applies that notion to Ponsock's tenured "discharge for just cause" employment relationship with his nationwide employer. *Id.* at 1371–72. *Ponsock* is a fact-specific case, not one of general application. In my judgment, it is a poor model from which to construct, without deep consideration, a new tort cause of action applicable to the universe of all at-will employment relationships in Wyoming.

The second Nevada case, *D'Angelo v. Gardner*, 107 Nev. 704, 819 P.2d 206 (1991), simply confirms *Ponsock*'s holding and then holds that the facts presented by the terminated two-year employee Jones do not fit the *Ponsock* "special relationship/bad faith" mold. Accordingly, the Nevada court rejected Jones' implied covenant tort claim. *D'Angelo*, at 215. So, *D'Angelo* offers nothing new.

From this analysis of the cases upon which the majority relies for the recognition of this new implied covenant tort claim, I must conclude that the discredited *Cleary* and the fact-specific obscure *Ponsock* are hardly strong support for the majority's decision.

The majority opinion is less than candid when it states "[t]he application of the implied covenant of good faith and fair dealing to contracts of employment has not been universally accepted." My research reveals that the acceptance of the implied covenant's application has been quite limited. In rejecting consideration of the breach of the implied covenant as a tort in Iowa, the Iowa Supreme Court observed in the fall of 1989:

Only a small handful of states have adopted the doctrine. Although [the plaintiff] suggests we adopt the action as a tort, four of the five states that recognize the covenant treat it as a contract-based action. *Hoffman–LaRoche, Inc. v. Campbell*, 512 So.2d 725, 738 (Ala.1987) (contract); *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 670, 254 Cal.Rptr. 211, 234–39,

765 P.2d 373, 389–96 (1988) (contract); *Fortune v. National Cash Register Co.*, 373 Mass. 96, 102, 364 N.E.2d 1251, 1256 (1977) (contract); *Gates v. Life of Montana Ins. Co.*, 196 Mont. 178, 638 P.2d 1063, 1067 (1982) (tort); *Monge* [*v. Beebe Rubber Co.*, 114 N.H. 130, 131, 316 A.2d 549, 551 (1974) ] (contract). New Hampshire, the leading state recognizing the covenant of good faith, has since limited the action to dismissals that are in violation of public policy. *Howard v. Dorr Woolen Co.*, 120 N.H. 295, 297, 414 A.2d 1273, 1274 (1980).

*Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 456–58 (Iowa 1989).

According to the Iowa court,

[t]he majority of jurisdictions that have addressed the covenant have unequivocally rejected it. See, *e.g., Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 377, 652 P.2d 625, 629 (1982); *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 227, 685 P.2d 1081, 1086 (1984); *Brockmeyer v. Dun & Bradstreet*, 113 Wis.2d 561, 569, 335 N.W.2d 834, 838 (1983); *Butterfield v. Citibank of South Dakota*, 437 N.W.2d [857] at 860 (S.D.1989); *Morriss v. Coleman Co., Inc.*, 241 Kan. 501, 738 P.2d 841, 851 (1987); *Sadler v. Basin Elec. Power Co-op*, 409 N.W.2d 87, 89 (N.D.1987); *Cockels v. Inter. Business Expositions, Inc.*, 159 Mich.App. 30, 36–37, 406 N.W.2d 465, 468 (1987); *Hunt v. IBM Mid–America Employees Fed. Credit Union*, 384 N.W.2d [853] at 858 (Minn.1986); *Neighbors v. Kirksville College of Osteopathic Medicine*, 694 S.W.2d 822, 824 (Mo.App.1985); *Larrabee v. Penobscot Frozen Foods Inc.*, 486 A.2d 97, 100 (Me.1984).

*Fogel*, 446 N.W.2d at 457.

The following additional jurisdictions have rejected the covenant: *Harrison v. Sears, Roebuck & Co.*, 189 Ill.App.3d 980, 137 Ill. Dec. 494, 546 N.E.2d 248, 256 (1989); *Hostettler v. Pioneer Hi–Bred Int'l, Inc.*, 624 F.Supp. 169, 172 (S.D.Ind.1985); *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 596 A.2d 1069 (1991); *Melnick v. State Farm Mut. Auto Ins. Co.*, 106 N.M. 726, 749 P.2d 1105, 1111 (1988); *Amos v. Oakdale Knitting*

*Co.*, 331 N.C. 348, 416 S.E.2d 166, 167 (1992); *Elliot v. Tektronix, Inc.*, 102 Or.App. 388, 796 P.2d 361, 365 (1990); *Randolph v. Dominion Bank*, 826 S.W.2d 477, 480 (Tenn. App.1991); *Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283–84 (Tex.1993); *Brehany v. Nordstrom*, 812 P.2d 49, 55 (Utah 1991); and *Shell v. Metropolitan Life Ins. Co.*, 183 W.Va. 407, 396 S.E.2d 174, 181 (1990). Although Alaska recognizes the covenant, breach of it does not give rise to recovery of tort damages unless public policy is involved. *ARCO Alaska, Inc. v. Akers*, 753 P.2d 1150, 1154 (Alaska 1988).

Because the majority has, without analysis and thorough consideration, latched onto the "special relationship" concept first considered in *Cleary* in which that intermediate appellate court relied on insurance cases, and which concept was echoed by the Nevada court in *Ponsock*, I find it revealing to consider the convincing rejection of that concept by the California Supreme Court. *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 389–401 (1988). The California Supreme Court's major criticism of the inferior court's *Cleary* decision was that decision's

> uncritical incorporation of the insurance model into the employment context, without careful consideration of the fundamental policies underlying the development of tort and contract law in general or of significant differences between the insurer/insured and employer/employee relationships.

*Foley*, 254 Cal.Rptr. at 230, 765 P.2d at 393.

Having identified the chief flaw in *Cleary*, the California Supreme Court next considered "the bases upon which extension of the insurance model to the employment sphere has been urged." *Foley*, 254 Cal.Rptr. at 232, 765 P.2d at 394. In this undertaking, the court reviewed scholarly commentary critical of the special relationship model. *Foley*, 254 Cal.Rptr. at 232–34, 765 P.2d at 394–95. From this review and from independent consideration of the similarities between insurance contracts and employment contracts, the court concluded:

> We are not convinced that a "special relationship" analogous to that between insur-

er and insured should be deemed to exist in the usual employment relationship which would warrant recognition of a tort action for breach of the implied covenant. *Foley*, 254 Cal.Rptr. at 233, 765 P.2d at 395. Explaining this conclusion, the court stated:

> Even if we were to assume that the special relationship model is an appropriate one to follow in determining whether to expand tort recovery, a breach in the employment context does not place the employee in the same economic dilemma that an insured faces when an insurer in bad faith refuses to pay a claim or to accept a settlement offer within policy limits. When an insurer takes such actions, the insured cannot turn to the marketplace to find another insurance company willing to pay for the loss already incurred. The wrongfully terminated employee, on the other hand, can (and must, in order to mitigate damages [see *Parker v. Twentieth Century–Fox Film Corp.* (1970) 3 Cal.3d 176, 181–182, 89 Cal.Rptr. 737, 474 P.2d 689] ) make reasonable efforts to seek alternative employment. (See Mauk, *supra*, 21 Idaho L.Rev. 201, 208). Moreover, the role of the employer differs from that of the "quasi-public" insurance company with whom individuals contract specifically in order to obtain protection from potential specified economic harm. The employer does not similarly "sell" protection to its employees; it is not providing a public service. Nor do we find convincing the idea that the employee is necessarily seeking a different kind of financial security than those entering a typical commercial contract. If a small dealer contracts for goods from a large supplier, and those goods are vital to the small dealer's business, breach by the supplier may have financial significance for individuals employed by the dealer or to the dealer himself. Permitting only contract damages in such a situation has ramifications no different from a similar limitation in the direct employer-employee relationship.

> Finally, there is a fundamental difference between insurance and employment relationships. In the insurance relationship, the insurer's and insured's interest

are financially at odds. If the insurer pays a claim, it diminishes its fiscal resources. The insured of course has paid for protection and expects to have its losses recompensed. When a claim is paid, money shifts from insurer to insured, or, if appropriate, to a third party claimant.

Putting aside already specifically barred improper motives for termination which may be based on both economic and noneconomic considerations, as a general rule it is to the employer's economic benefit to retain good employees. The interests of employer and employee are most frequently in alignment. If there is a job to be done, the employer must still pay some one to do it. This is not to say there may never be a "bad motive" for discharge not otherwise covered by law. Nevertheless, in terms of abstract employment relationships as contrasted with abstract insurance relationships, there is less inherent relevant tension between the interests of employers and employees than exists between that of insurers and insureds. Thus the need to place disincentives on an employer's conduct in addition to those already imposed by law simply does not rise to the same level as that created by the conflicting interests at stake in the insurance context. Nor is this to say that the Legislature would have no basis for affording employees additional protections. It is, however, to say that the need to extend the special relationship model in the form of judicially created relief of the kind sought here is less compelling.

We therefore conclude that the employment relationship is not sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies in view of the countervailing concerns about economic policy and stability, the traditional separation of tort and contract law, and finally, the numerous protections against improper terminations already afforded employees.

*Foley,* 254 Cal.Rptr. at 233–35, 765 P.2d at 395–96 (footnote omitted).

For the remainder of its opinion, the *Foley* court explored the propriety of judicial, rather than legislative, expansion of remedies for employees improperly discharged. *Foley,* 254 Cal.Rptr. at 235–40, 765 P.2d at 397–401. In this regard, several factors joined to persuade the court that contractual, not tort, remedies "should remain the sole available relief for breaches of the implied covenant of good faith and fair dealing in the employment context" absent legislative action. *Id.,* 254 Cal.Rptr. at 236, 765 P.2d at 398. Discussing these factors, the court said:

> Initially, predictability of the consequences of actions related to employment contracts is important to commercial stability. In order to achieve such stability, it is also important that employers not be unduly deprived of discretion to dismiss an employee by the fear that doing so will give rise to potential tort recovery in every case.
>
> Moreover, it would be difficult if not impossible to formulate a rule that would assure that only "deserving" cases give rise to tort relief. Professor Summers, in his seminal article, described the term "good faith" as used in the duty of good faith imposed in contract law and the Uniform Commercial Code, as an "excluder" phrase which is "without general meaning (or meanings) of its own and serves to exclude a wide range of heterogenous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out." (Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code* (1968) 54 Va.L.Rev. 195, 201, fn. omitted.) In a tort action based on an employee's discharge, it is highly likely that each case would involve a dispute as to material facts regarding the subjective intentions of the employer. As a result, these actions could rarely be disposed of at the demurrer or summary judgment stage.
>
> \* \* \* \* \* \*
>
> Thus, recitation of the parameters of the implied covenant alone is unsatisfactory. If the covenant is implied in every contract, but its breach does not in every contract give rise to tort damages, attempts to define when tort damages are

appropriate simply by interjecting a requirement of "bad faith" do nothing to limit the potential reach of tort remedies or to differentiate between those cases properly and traditionally compensable by contract damages and those in which tort damages should flow. Virtually any firing (indeed any breach of a contract term in any context) could provide the basis for a pleading alleging the discharge was in bad faith under the cited standards.

Finally, and of primary significance, we believe that focus on available contract remedies offers the most appropriate method of expanding available relief for wrongful terminations. The expansion of tort remedies in the employment context has potentially enormous consequences for the stability of the business community.

We are not unmindful of the legitimate concerns of employees who fear arbitrary and improper discharges that may have a devastating effect on their economic and social status. Nor are we unaware of or unsympathetic to claims that contract remedies for breaches of contract are insufficient because they do not fully compensate due to their failure to include attorney fees and their restrictions on foreseeable damages. These defects, however, exist generally in contract situations. As discussed above, the variety of possible courses to remedy the problem is well demonstrated in the literature and include increased contract damages, provision for award of attorney fees, establishment of arbitration or other speedier and less expensive dispute resolution, or the tort remedies (the scope of which is also subject to dispute) sought by plaintiff here.

The diversity of possible solutions demonstrates the confusion that occurs when we look outside the realm of contract law in attempting to fashion remedies for a breach of a contract provision. As noted, numerous legislative provisions have imposed obligations on parties to contract which vindicate significant social policies extraneous to the contract itself. As Justice Kaus observed in his concurring and dissenting opinion in *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 901, 221 Cal.Rptr. 509, 710 P.2d 309, "our experience in *Seaman's* [*Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984)] surely tells us that there are real problems in applying the substitute remedy of a tort recovery—with or without punitive damages—outside the insurance area. In other words, I believe that under all the circumstances, the problem is one for the Legislature . . . ."

*Foley,* 254 Cal.Rptr. at 236–40, 765 P.2d at 398–401 (footnotes omitted).

At the present time, the *Foley* analysis best captures my thinking on this subject—if we must today decide the point, which, as I have said earlier, I do not think we need do.

Finally, about the majority's holding that sufficient evidence of the Chamber's outrageous conduct exists, I respectfully disagree. Particularly with reference to the Chamber's conduct following termination, I find it incongruous to hold that the Chamber's aggressiveness as a competitor is outrageous conduct but does not constitute intentional interference with prospective business relations. Perhaps these two concepts can legally coexist, but I am not convinced at this point. As I understand the concept of outrageous conduct as explained in *Leithead,* the claim contains two requirements, *viz.,* outrageous conduct and severe emotional distress. *Leithead,* 721 P.2d at 1065–67. Outrageous conduct is "conduct which goes beyond all possible bounds of decency, is regarded as atrocious, and is utterly intolerable in a civilized community." *Leithead,* at 1066. Severe emotional distress is "distress which is so severe that no reasonable [person] could be expected to endure it." *Id.* From my reading of the record, the Chamber's conduct was not "outrageous," and Mr. Wilder's distress was not "severe emotional distress" as the law defines those terms.