896 F.Supp. 1574 (1995)
CENEX, INC., f/k/a Farmers Union Central Exchange, Inc., A Minnesota Corporation, Plaintiff,
v.
ARROW GAS SERVICE, a Wyoming Corporation, Nancy G. Frederick; Alan L. Frederick; Debra F. Douglas, Jerald N. Frederick; and Sandra S. Aune, Defendants.
No. 94-CV-302-J.
United States District Court, D. Wyoming.
July 20, 1995.
*1575 *1576 Stephen N. Sherard, Rex Johnson, Sherard, Sherard & Johnson, Wheatland, WY, Edward F. Fox, Doherty, Rumble & Butler, St. Paul, MN, for Cenex Inc., plaintiff.
Paul John Drew, Drew & Carlson, Gillette, WY, for Arrow Gas Service, Nancy G. Frederick, Alan L. Frederick, Debra F. Douglas, Jerald N. Frederick, Sandra S. Aune, defendants.
ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ALAN B. JOHNSON, Chief Judge.
The plaintiff's motion for summary judgment and the defendants' motion for partial summary judgment came before the Court for hearing on June 23, 1995. The Court, having considered the motions, the parties' responses one to the other, the materials submitted by the parties both in support of and in opposition to the motions, and being fully advised in the premises, FINDS and ORDERS as follows:

Background
The plaintiff, Cenex, is a Minnesota corporation which is a distributor of propane. In October of 1992, Cenex purchased the propane business of Arrow Gas Service ("Arrow Gas") for a base price of $1.6 million, together with other future payments of approximately $1 million. The parties agreed to a "Purchase Price Adjustment" clause in their purchase and sale agreement, which required future adjustment of the purchase price according to the actual number of gallons of propane gas sold by Cenex in the two year period following the closing date. The Purchase Price Adjustment was based on a cumulative benchmark sales figure of 6,000,000 gallons of propane and provided for a price reduction of $.40 per gallon for each gallon below the 6,000,000 gallon threshold, up to a total of $200,000. This Purchase Price Adjustment clause also provided for a supplemental payment of $.40 per gallon to Arrow Gas for each gallon above that figure, up to a maximum of $400,000.
In November of 1994, Cenex claims that the total amount of propane sold in the applicable two year period following the closing date of the purchase agreement was 4,603,100 *1577 gallons of propane, resulting in a payment due to Cenex in the amount of $200,000. It is not disputed that sales of propane by Cenex in the applicable two year period failed to reach the 6,000,000 benchmark provided for in the parties' agreement.
Cenex contends Arrow Gas has repudiated the Purchase Price Adjustment obligation. Defendant Arrow Gas has denied liability, asserts various defenses and counterclaims and seeks recovery of the full purchase price adjustment that Arrow Gas now claims it is entitled to recover in the amount of $400,000. Arrow Gas also seeks to recover punitive damages in the total amount of $10 million. Arrow Gas claims that Cenex operated the business in a manner that deliberately suppressed sales to avoid further payment to Arrow Gas under the Purchase Price Adjustment provision of the parties' contract.
Cenex responds that it operated the business in good faith to maximize revenues and profits and that it had no incentive to suppress sales. Cenex argues that propane sales did not reach the 6,000,000 gallon threshold for a variety of reasons including weather, market and economic factors.
Arrow Gas has also claimed that Cenex breached the covenant of good faith and fair dealing by closing the company's Sheridan plant site and by selling certain assets associated with the Gillette and Upton plant sites in the ordinary course of business. Arrow Gas now seeks damages from the plaintiff for this claimed breach of the covenant of good faith and fair dealing.
Cenex now argues it is entitled to summary judgment for the amount due under the Purchase Price Adjustment provision and that the counterclaims of defendant are based on unsubstantiated innuendo and strained contract interpretations designed to obfuscate Cenex's claim for breach of contract. Cenex seeks summary judgment in its favor, based upon the undisputed agreement of the parties that: 1) the applicable provisions of the Purchase Agreement are not ambiguous, determining that the shortfall in excess of one-half million gallons of propane entitles it to the $200,000 Purchase Price Adjustment pursuant to the terms of the parties' contract; 2) dismissal of the counterclaims asserted by defendants against plaintiff; and 3) dismissal of defendants' claim for $10,000,000 in punitive damages.

Standard of Review
Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits on file, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue concerning any material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party's burden may be met by identifying those portions of the record demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether these burdens have been met, the court is required to examine all evidence in the light most favorable to the non-moving party. Barber v. General Electric Co., 648 F.2d 1272 (10th Cir.1981).
Once the moving party has met its initial burden, the burden shifts to the party resisting the motion. That party must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Manders v. Oklahoma ex rel. Dept. of Mental Health, 875 F.2d 263, 265 (10th Cir.1989) citing Celotex, 477 U.S. at 325, 106 S.Ct. at 2554.

Discussion
The Agreement of Purchase and Sale of Assets By and Between Arrow Gas Service ["Arrow Gas"] and Farmers Union Central Exchange, Incorporated ["Cenex"] is dated as of October 26, 1992. The full agreement is attached to the complaint as Exhibit A, and is a commercial transaction for the acquisition of the propane gas operations of Arrow Gas in Wyoming.
Section 1.01 describes the assets to be sold:
*1578 Section 1.01. PURCHASE AND SALE OF ASSETS. Subject to the terms and conditions of this Agreement, on the Closing Date (as such term is defined in Section 5.01 of this Agreement) Seller shall sell, assign, transfer and convey, and CENEX shall purchase, assume, and accept legal title to all of the following described assets of Seller employed in or associated with the Business (all such assets are hereinafter collectively referred to as the "Assets"):
(a) Machinery and Equipment. All plant machinery and equipment including buildings, delivery equipment, bulk storage tanks and customer storage tanks associated with the Plant Sites, including that which is described on Exhibit 1.01(a) attached hereto and incorporated herein, together with all office equipment, furniture, tools and fixtures owned and used by Seller at its office in Gillette, Wyoming (the "Machinery and Equipment");
(b) Real Property. All real property which is described on Exhibit 1.01(b), attached hereto and incorporated herein (the "Real Estate");
(c) Contracts and Leases. All rights of Seller under the contracts, leases, agreements and personal property leases listed on Exhibit 1.01(c) attached hereto and incorporated herein (the "Contracts and Leases");
(d) Retail Inventory. All propane product inventory on hand at the Plant Site(s), in delivery equipment or in meter tanks or cylinders on customers' premises, and all whole goods and parts inventory (e.g. furnaces, water heaters, regulators, fittings, copper tubing, piping, etc.) that is associated with or related to the Business or the Assets, and which is on hand at the Plant Site(s), as of the close of business on the date before the Closing Date (the "Retail Inventory");
(e) Materials and Supplies. All miscellaneous office and shop materials and supplies owned by Seller, associated with the Business and located at the Plant Site(s) as of the Closing Date (the "Materials and Supplies");
(f) Prepaid Expenses. All prepaid expenses allocated to periods following the Closing Date that are related to the Assets and which are identified by category in Exhibit 1.01(f), attached hereto, and reflected on the books and records of the Business as of the Closing Date (the "Prepaid Expenses").
(g) Business Records. All business records, customer lists, and books maintained by Seller in connection with the Assets or the operation of the Business as of the Closing Date (the "Business Records").
(h) Trade Name. The trade name "Arrow Gas Service" used by Seller in connection with the Business (the "Trade Name").
Section 1.04 of the parties' agreement provides:
SECTION 1.04. PURCHASE PRICE ADJUSTMENT.

(a) Calculation of the Purchase Price Adjustment. The Purchase Price for the Assets shall be adjusted following the second anniversary of the Closing Date based upon the volume of propane sold by CENEX during such two (2) year period in the following manner.
(i) Purchase Price Increase. In the event the volume of propane sold by CENEX in the Arrow Trade Territory during such two (2) year period exceeds a cumulative total of six million gallons, CENEX shall pay to Seller an amount equal to forty cents (40¢) per gallon for each gallon in excess of six million gallons, up to a maximum of four hundred thousand dollars ($400,000); or
(ii) Purchase Price Reduction. In the event the volume of propane sold by CENEX in the Arrow Trade Territory during such two (2) year period is less than a cumulative total of six million gallons, Seller shall pay to CENEX an amount equal to forty cents (40¢) per gallon for each gallon less than six million gallons, up to a maximum of two hundred thousand dollars ($200,000). *1579 The Purchase Price adjustment calculated pursuant to this Paragraph shall hereinafter be referred to as the "Purchase Price Adjustment." For purposes of this Paragraph, the "Arrow Trade Territory:" shall mean the Wyoming Counties of Sheridan, Johnson, [Big Horn], Campbell, Crook, Weston, Natrona, Converse, Niobrara, and Washakie and the Montana Counties of Carter, Fallon, Powder River, Custer, Rosebud, and Big Horn; provided that (aa) domestic propane sales (sales other than to oil fields and coal mines) in the Wyoming Counties of Natrona, Converse, and Niobra [sic], and (bb) propane sales resulting from existing CENEX propane plants or the future acquisitions by CENEX, shall not be used in calculating the volume of propane sold by CENEX in the Arrow Trade Territory. In the event CENEX elects to sell the Assets associated with the Sheridan, Wyoming Plant Site to a third party during the two year period provided for in the Purchase Price Adjustment, the volume of propane sales attributable to that Plant Site during such two year period shall be seven hundred thousand (700,000) gallons. In the event CENEX elects to sell Assets associated with either the Gillette or Upton Plant Sites, or both, during the two years provided for the in the Purchase Price Adjustment, CENEX shall pay to the Seller the sum of Four Hundred Thousand ($400,000) Dollars at the time and in the manner provided for in subparagraph (b) of this Section 1.04.
(b) Payment of Purchase Price Adjustment. The Purchase Price Adjustment shall be calculated by CENEX and notice of the amount of such adjustment shall be given to Seller within thirty (30) days after the second anniversary of the Closing Date. The payment of the Purchase Price Adjustment shall be made by the party required to make such payment on the basis of one of the following options (to be determined by the paying party):
(i) the full Purchase Price Adjustment may be paid within ten (10) days after the notice is given, or
(ii) fifty percent (50%) of the Purchase Price Adjustment shall be paid within ten (10) days after the notice is given with the remaining fifty percent (50%) due within one (1) year of the date the notice is given, together with interest thereon at the rate of one percent (1%) in excess of the "Prime Rate" as published in the Wall Street Journal on the date the payment is due. Interest shall accrue and be paid on any past due payment at a rate equal to one percent (1%) in excess of the "Prime Rate" as published in the Wall Street Journal on the day the payment is due.
(c) Reporting and Audit. For purposes of this Section 1.04, CENEX shall provide Seller with semi-annual reports beginning six months following the Closing Date, which reports shall provide Seller with information concerning the volume of propane sold by CENEX in the Arrow Trade Territory. Seller shall have the right to audit the records of CENEX, at Seller's sole cost, at any time prior to the payment of the Purchase Price Adjustment or within thirty (30) days thereafter for purposes of verifying the propane sales of CENEX in the Arrow Trade Territory.
The interpretation of an unambiguous contract presents simply a question of law for the Court, and disposition of disputes relating to such a contract may be properly accomplished by summary judgment. Continental Ins. v. Page Engineering Co., 783 P.2d 641, 650 (Wyo.1989). If the contract is in writing and the language is unambiguous, the intention of the parties is to be ascertained from the words of the contract considering the contract as a whole, with each part being read in light of all the other parts. Busch Development, Inc. v. City of Cheyenne, 645 P.2d 65, 71 (Wyo.1982). However, when the language of a contract is clear, the Court does not look beyond the four corners of the document to determine the contractual intent of the parties. Holst v. Guynn, 696 P.2d 632, 634 (Wyo.1985). See also Moncrief v. Williston Basin Interstate Pipeline Co., 880 F.Supp. 1495, 1514 (D.Wyo.1995).
Parties to a contract are presumed to know the terms of the contract, and to know the law and to contract with reverence to the law. Czapla v. Grieves, 549 P.2d *1580 650, 654 (Wyo.1976); Walliker v. Escott, 608 P.2d 1272, 1277 (Wyo.1980). Once a person signs a document, the terms of the contract control; he or she cannot avoid its effect by asserting that his or her understanding was contrary to the terms, or that he or she believed it was different in its terms. First State Bank of Wheatland v. American Nat. Bank, 808 P.2d 804, 806 (Wyo.1991). The parol evidence rule dictates that an agreement cannot be contradicted or construed contrary to the clear language encompassed in it simply on the basis of an asserted subjective intent of the parties. Hayes v. American Nat. Bank of Powell, 784 P.2d 599, 604 (Wyo.1989).
In this case, the Court is of the opinion that the contract between the parties is indeed clear and that the dispute between the parties may be resolved by looking at the four corners of the document in question. The express terms of the parties' contract are set out above. The defendants' contentions and arguments are without merit, are specious and are not supported by the language of the parties' agreement. This Court has the obligation to construe a contract so that the ultimate disposition of the parties' disputes makes sense and corresponds to the contractual language used by the parties. Busch Development, Inc. v. City of Cheyenne, 645 P.2d at 68 ("In giving effect to the intent of the parties, common sense and good faith are the leading characteristics of contract construction[,]" citing Marathon Oil Co. v. Kleppe, 407 F.Supp. 1301 (D.Wyo.1975), aff'd 556 F.2d 981 (10th Cir.1977).
The Court does not find persuasive defendants' argument that defendants are entitled to a Purchase Price Adjustment [increase] in the amount of $400,000 because plaintiff sold certain assets, although not identified with specificity in the pleadings, including tanks and old vehicles, that were "associated with" the Gillette or Upton plant sites during the two year period following the closing date of the agreement between the parties. The plaintiff admits that Cenex routinely leased, sold and purchased propane gas inventory, tanks and vehicles in the ordinary course of business with respect to the operation of the business acquired pursuant to the Purchase Agreement which Cenex continues to own and operate in Gillette and Upton. Plaintiff's Reply to Counterclaim of Defendant Arrow Gas, ¶ 3. Plaintiff denies that such routine, ordinary course of business transactions entitled the defendants to the relief sought. This Court agrees. Such claims are beyond the purview of the parties' agreement and not reasonably contemplated by the parties when they entered into that agreement. The Agreement defines "assets" in a collective fashion. There simply is no evidence in the record before this Court to suggest that the sale or disposal of isolated assets would serve to trigger Section 1.04 of the Purchase Agreement and cause a Price Increase Adjustment in the amount of $400,000 to become due to Arrow Gas from Cenex.
This Court also rejects defendants' arguments insofar as they assert that Cenex has breached the covenant of good faith and fair dealing when plaintiff operated the business in the manner it did during the two year period following closing of the parties' agreement. The defendants argue that the covenant of good faith and fair dealing was breached when Cenex closed the Upton business office and consolidated it with the Gillette office, when Cenex closed the Sheridan site and provided no more customer services from that office during the two year period following the closing date of the parties' agreement, when Cenex refused to learn the nature of the oil field sales conducted from Upton, when Cenex terminated a collateral Consulting Agreement, when Cenex prohibited its employees from contacting Nancy Frederick, when Cenex shipped propane tanks from Wyoming, when Cenex failed to reasonably advertise, market, and sell propane tanks and ceased personal contacts with propane customers.
Upon its own review of the Purchase Agreement between the parties, the Court believes that the defendants' contentions are not supported by the materials in the record before the Court and merely require the Court to engage in speculation and unsupported innuendo in arriving at some conclusion regarding the plaintiff's motives in the effort to explain or understand why Cenex conducted the business in the manner in *1581 which it did. The Court may not engage in such speculation.
The parties could have contracted to require payment of a Purchase Price Adjustment in the event that the Upton or Sheridan offices were closed, rather than sold outright, by Cenex following the acquisition of Arrow Gas.[1] They did not do so. The parties could have contracted to require payment of a Purchase Price Adjustment or other appropriate payment in the event that only a portion or only certain assets, defined in a manner other than as defined specifically in the parties' agreement, were sold or disposed of either within or without the ordinary course of business. However, they did not do so. The Court's review of this agreement and its explicit language causes the Court to conclude that plaintiff correctly asserts that Cenex is entitled to the Purchase Price Adjustment (the $200,000 Purchase Price Reduction) in accordance with the express language of Section 1.04 of the agreement, set forth above in entirety.
With respect to the defendants' assertions regarding the breach of the covenant of good faith and fair dealing, the Court offers the following observations. The Wyoming Supreme Court adopted the implied covenant of good faith and fair dealing in Wilder v. Cody Country Chamber of Commerce, 868 P.2d 211, 220-221 (Wyo.1994). The Wyoming Court's reasoning, although discussing the covenant of good faith and fair dealing in the context of employment contracts, has equal application in this case. The Wyoming Court stated:
The Restatement (Second) of Contracts § 205 at 99 (1981) recognizes an implied duty under every contract:
§ 205 Duty of Good Faith and Fair Dealing
Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. Good faith means "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving `bad faith' because they violate community standards of decency, fairness or reasonableness." Id. at 100, cmt. a (emphasis added). See Garner v. Hickman, 709 P.2d 407, 411 (Wyo.1985) (referring to definition of "good faith" under Uniform Commercial Code as honesty in fact in the conduct of the transaction concerned).
Wilder v. Cody Country Chamber of Commerce, 868 P.2d at 220. The Wyoming Court continued in that opinion, discussing applicability of the implied covenant of good faith and fair dealing to contracts of employment:
The Supreme Court of Arizona correctly summarized that the implied covenant "does not create a duty for the employer to terminate the employee only for good cause." ... For example, we do not consider it appropriate to read into the implied covenant language mandating that every termination must be for a "fair and honest reason." ... However, we conclude that the implied covenant, with appropriate limitations, serves to balance the inherently unequal relationship between an employer and an employee....
We hold that recovery of damages is permitted for tortious conduct which arises out of a contractual relationship of employment in breach of the implied covenant of good faith and fair dealing....
A tort, however, requires the presence of a duty created by law, not merely a duty created by contract; and, although a duty of good faith and fair dealing is created by law in all cases, it is only in rare and exceptional cases that the duty is of such a nature as to give rise to tort liability. The kind of breach of duty that brings into play the bad faith tort arises only when *1582 there are special relationships between the tort-victim and the tort-feasor * * *. ... The special relationship necessary to permit recovery is not established merely by the employer-employee relationship. A showing is required that a special relationship of trust and reliance exists between the particular employee seeking recovery and the employer.... Trust and reliance may be found by the existence of separate consideration, common law, statutory rights, or rights accruing with longevity of service....
Wilder v. Cody Country Chamber of Commerce, 868 P.2d at 221-222 (citations omitted).
In the instant case, defendants seem to urge that a special relationship exists by virtue of the unique circumstances presented in the case, although they offer little other than conclusory statements as support for their contentions. This Court is of the opinion that, as the Wyoming Supreme Court noted, a breach of the implied covenant of good faith and fair dealing rising to the level of a compensable tortious breach of duty requires that there exist an independent tort dutya duty other than that arising by virtue of the contract between the parties.
This Court is unable to ferret out any such independent duty or any special relationship of trust and reliance between the parties other than as provided for in the contract between the parties in this case. Without more specific allegations or references to where it may be found in the materials now before the Court, "`we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.' ante at 1025; accord, United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). We cannot consider these unsubstantiated allegations[.]" Gross v. Burggraf Const. Co., 53 F.3d 1531, 1546 (10th Cir.1995), quoting Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1025 (10th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992).
The plaintiff contends that the relationship between plaintiff and the defendants was a commercial business transaction and is insufficient to permit the "special relationship" described in Wilder to develop. Further, it does not appear that separate consideration was given upon which defendants relied, and there simply is no evidence suggesting that the covenant of good faith and fair dealing was breached as a means of avoiding payment of a Purchase Price Adjustment to Arrow Gas if the contract and surrounding facts, i.e., sales of propane, so warranted. There is no evidence of misconduct or bad faith on the part of Cenex when the agreement was entered into in October of 1992. There is no evidence to show any willful or deliberate effort to suppress the purchase price agreed to by the parties or actual sales of propane so as to avoid payment of any applicable Purchase Price Adjustment.
The Court finds there are no genuine issues of material fact facts for resolution by the jury in this case. The tort remedy for a breach of the implied covenant of good faith and fair dealing addresses especially egregious conduct and provides a remedy for violating community standards of decency, fairness or reasonableness. The covenant should not be viewed too broadly, for the risk is that it may be misapplied. A further "fundamental limitation of the implied covenant is that it cannot create duties that supersede express provisions of written contracts." Wilder v. Cody Country Chamber of Commerce, 868 P.2d at 221, citing Farris v. Hutchinson, 254 Mont. 334, 838 P.2d 374, 377 (1992).
Here, the defendants seek to avoid the terms of the express written agreement by requesting the Court to find duties or contractual obligations where there are no contractual obligations. This includes, by way of example only, the request for a finding that defendants are entitled to a Purchase Price Adjustment Increase in the amount of $400,000 because certain equipment, including tanks and outdated vehicles, were sold in the ordinary course of Cenex's day to day business. This is not a case where the tort remedy for breach of the implied covenant of good faith and fair dealing is necessary to address egregious conduct, for there is no *1583 egregious conduct, nor is it a case where a remedy must be provided for violating community standards of decency, fairness or reasonableness. Be that as it may, the alleged duties defendants now allege have been breached by Cenex do not supersede the express terms of the parties' written agreement. The terms of that contract should be given effect by this Court.
With respect to the defendants' claims for punitive damages, the Court likewise finds that there is no evidence before it, particularly in this commercial context, suggesting that Cenex engaged in any willful, wanton, or malicious conduct at the time of inception of the contract. For punitive damages to be recoverable, there must be conduct on the part of the actor amounting to aggravation, outrage, malice or willful and wanton misconduct. Waters v. Trenckmann, 503 P.2d 1187, 1190 (Wyo.1973). There must be evidence of spite, ill will or willful and wanton misconduct on the part of [the actor] in the inception of the contract. Id. at 1191. Even an unjustified breach of a contract, if one indeed exists, does not entitle the opposing party to punitive damages. "The general rule regarding damages for breach of contract limits the award to the pecuniary loss sustained." United States v. Redland, 695 P.2d 1031, 1039 (Wyo.1985), quoting Modern Air Conditioning v. Cinderella Homes, Inc., 226 Kan. 70, 596 P.2d 816 (1979). See also Sheridan Commercial Park v. Briggs, 848 P.2d 811, 817-818 (Wyo.1993) (Replevin action).
Discussing punitive damages in the context of a personal injury case, the Wyoming Supreme Court has stated:
"* * * Punitive damages are not a favorite of the law and are to be allowed with caution within narrow limits.... Since the purpose of punitive damages is not to compensate a plaintiff, but to punish a defendant and deter others, such damages are to be awarded only for conduct involving some element of outrage, similar to that usually found in crime. Restatement (Second of Torts § 908 Comment B (1979). The purpose of punitive damages is not to provide a windfall to plaintiffs and their attorneys, but is to publicly condemn some notorious action or inaction on the part of the defendant....
"We have approved punitive damages in circumstances involving outrageous conduct, such an intentional torts, torts involving malice and torts involving willful and wanton misconduct. Punitive damages are not appropriate in circumstances involving inattention, inadvertence, thoughtlessness, mistake, or even gross negligence....
* * * * * *
"Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another." ...
Mayflower Restaurant Co. v. Griego, 741 P.2d 1106, 1115 (Wyo.1987) (citations omitted). In the replevin case cited above, Sheridan Commercial Park v. Briggs, 848 P.2d at 818, the Wyoming Supreme Court, quoting from Mayflower Restaurant Co. v. Griego, 741 P.2d at 1116, stated that "Sometimes the line between conduct justifying punitive damages and less culpable conduct is fine." This is not such a case.
Having carefully reviewed the pleadings and the materials in support of and in opposition to the motions for summary judgment, the Court finds that the defendants' claim for punitive damages must fail. Because there is a complete dearth of such evidence, summary judgment in favor of Cenex and an order dismissing defendants' claims for punitive damages is appropriate.
The Court has read and reviewed carefully all of the documents offered by the parties in support of their arguments. After this review, the Court concludes that plaintiff is entitled to summary judgment in all respects. Accordingly, and for the reasons set forth above, the Court finds that there are no genuine issues of material fact and that plaintiff, Cenex, is entitled to summary judgment in its favor as a matter of law. It is therefore
*1584 ORDERED that the plaintiff's Motion for Summary Judgment shall be, and is, GRANTED in all respects. It is further
ORDERED that all counterclaims asserted against plaintiff by defendant shall be, and are, DISMISSED. It is further
ORDERED that defendants' claim for punitive damages shall be, and is, DISMISSED. It is further
ORDERED that the defendant's motion for partial summary judgment shall be, and is, DENIED.
NOTES
[1] Assuming for purposes of argument that the contract between the parties did provide for a purchase price adjustment upon closure, rather than sale of the Sheridan plant, which it did not do, the contract specifically provides that this would result in a 700,000 gallon adjustment to the propane gallonage for the two year period following the closing date of the agreement. If such an adjustment had been made in the full 700,000 gallon amount, propane sales still would have been short of the 6,000,000 benchmark figure agreed to by the parties in their contract, with a total propane gallonage of 5,303,100 (4,603,100 + 700,000). In fact, as Exhibit D to the Morin Affidavit explains, a 175,000 gallon adjustment was made for the Sheridan plant.