**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 29 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WALTER H. MARTINEZ,

      Plaintiff-Appellant,

v.

TG SODA ASH, INC., a Delaware
corporation,

      Defendant-Appellee.

No. 97-8070
(D.C. No. 96-CV-307-J)
(District of Wyoming)

---

**ORDER AND JUDGMENT** *

---

Before **SEYMOUR** , Chief Judge, and **PORFILIO** and **HENRY** , Circuit Judges.

---

Walter H. Martinez appeals the district court's grant of summary judgment

to TG Soda Ash, Inc. ("TG"). Because the district court correctly determined that

---

*After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination
of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. Therefore, we
grant Walter H. Martinez's request for a decision on the briefs and order this case
submitted without oral argument.

    This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Mr. Martinez failed to demonstrate a genuine issue of material fact as to whether TG had breached his employment contract, we affirm.

## FACTS

From April 1978 until May 1996, Mr. Martinez worked at TG's soda ash production facility in Sweetwater County, Wyoming. On March 13, 1996, after experiencing back pain, Mr. Martinez visited his chiropractor, Dr. Debra Arguello. During this visit, Dr. Arguello instructed Mr. Martinez not to work from March 13 through March 31 in order to allow his back to heal. Mr. Martinez subsequently telephoned his supervisor and informed him that he would be out of work from March 13 through March 31 in order to recuperate from his back injury and to obtain treatment. Mr. Martinez later submitted a note to TG from Dr. Arguello in which the doctor "recommend[ed] [that] Walter remain off work 3-13-96--3-31-96, so as not to further aggravate his low back." See Aplt's App. at 211.

Dr. Arguello referred Mr. Martinez to a specialist, Dr. Mark McGlothlin, who examined Mr. Martinez on March 26 and tentatively diagnosed him as suffering from unhealed fractured ribs. Dr. McGlothlin recommended a bone scan to confirm this diagnosis. Mr. Martinez visited Dr. McGlothlin again on April 2, at which time Dr. McGlothlin conducted a bone scan that revealed a possible rib fracture. Dr. McGlothlin then recommended a CT scan. On April 12,

2

Dr. McGlothlin gave Mr. Martinez a note that read, "Walter is under the care of Dr. McGlothin [sic] for his back and ribs. He had an MRI on 4-2-96. We are in the process of scheduling a CT scan, no change in working status pending results of CT scan." See Aplt's App. at 224. Mr. Martinez underwent a CT scan on April 13. On or about April 14, Mr. Martinez delivered the note from Dr. McGlothlin to the safety supervisor at TG.

On April 16, Robert MacAdams, TG's human resources manager, sent a letter to Mr. Martinez that stated:

> Effective . . . April 20, 1996 you are placed on indefinite suspension without pay for excessive absenteeism. The suspension will be removed only if you can . . . . demonstrate that you could not have worked at any time during your absence, that you have been under constant care of a qualified physician, what you are suffering from, and that you have been aggressively seeking treatment.

See Aplt's App. at 280 (emphasis omitted).

On April 18, Dr. McGlothlin drafted a letter to Dr. Arguello, which he copied to Mr. MacAdams, that stated:

> CT scan was . . . completed . . . 4/13/96, with scan delineating evidence of a compression deformity . . . [and] degenerative changes of the thoracic spine. . . . I strongly suggested to Mr. Martinez that he will continue to suffer intermittent . . . spinal axis pain. . . . I would suggest the patient is clearly capable of returning to his present job, . . . and I have suggested that he do so with all expediency. Mr. Martinez informs me that you are his attending physician of record and that his work release must come from your office.

Aplt's App. at 225-26. On April 22, Dr. Arguello released Mr. Martinez to return to work on the following day.

Mr. Martinez called his foreman on April 22 and informed the foreman that he would be available to work the next day. Mr. Martinez came to work on April 23, but prior to his scheduled shift, Mr. MacAdams asked to meet with him. In the meeting, Mr. Martinez provided Mr. MacAdams with a copy of Dr. Arguello's release. However, Mr. MacAdams stated that the release did not satisfactorily address all of the issues raised in the April 16 letter and informed Mr. Martinez that TG would not permit him to work until he provided TG with documentation that addressed all of the issues raised in the letter.

The next day, Mr. Martinez met with Mr. MacAdams and two other TG superiors and gave them copies of his medical records, which included all of the correspondence described above. After examining the records, Mr. MacAdams informed Mr. Martinez that this documentation was insufficient and instructed him to provide TG with medical documentation justifying his absence. Mr. MacAdams told Mr. Martinez to return on April 26 in order to meet again. On April 26, Mr. Martinez again met with Mr. MacAdams and several other TG managers. The managers again informed Mr. Martinez that he had failed to provide sufficient justification for his absence and gave him two weeks to provide documentation demonstrating that he could not have worked from April 1 until

4

April 22. When Mr. Martinez did not provide TG with any additional documentation within the two-week period, the company terminated his employment.

## THE LITIGATION

Mr. Martinez sued TG in Wyoming state court, alleging that TG breached his implied contract of employment when it terminated him. TG removed the case to the United States District Court for the District of Wyoming on diversity grounds. Mr. Martinez moved for partial summary judgment, seeking a ruling that TG's employment and personnel policies constituted an implied-in-fact employment contract that required just cause for discharge. TG also moved for summary judgment, arguing that Mr. Martinez was an at-will employee or, in the alternative, that the company had not breached any implied contract. The district court granted TG's motion, holding that even though there was sufficient evidence to allow the question of the existence of an implied contract to go to the jury, Mr. Martinez had failed to demonstrate a genuine issue of material fact on the question of breach. The court denied Mr. Martinez's motion as moot. Mr. Martinez appeals only the district court's grant of summary judgment to TG.

## DISCUSSION

### I.      Standard of Review

We review de novo the district court's grant of summary judgment, applying the same legal standard as the district court.      Lowe v. Angelo's Italian Foods, Inc.  , 87 F.3d 1170, 1173 (10th Cir. 1996).  Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.      Seymore v. Shawver & Sons, Inc.  , 111 F.3d 794, 797 (10th Cir.),    cert. denied  , 118 S. Ct. 342 (1997).

### II.      Mr. Martinez Possessed An Implied Contract Of Employment

The district court held that Mr. Martinez came forward with sufficient evidence to withstand summary judgment on the issue of whether he possessed an implied contract of employment.  In arriving at this holding, the district court relied, in relevant part, on three documents that TG produced.

#### A.      TG's Work Rules and General Conditions of Employment

The first of these documents, a memorandum entitled "General Conditions of Employment," was printed on TG stationery and bore Mr. MacAdams's signature.  This document lists eighteen work rules that "have been set forth as guidelines for employee conduct" and provides that "[a]ll violations of these rules are subject to disciplinary action and may lead to dismissal."      See Aplt's App. at

6

292-93. It also lists three other rules, the violation of which will be "cause for immediate dismissal." See id. at 293. At deposition, Mr. Martinez testified that TG gave him a copy of this memo while he was employed by the company.

The second document the district court cited was TG Personnel Policy 2.1, "Work Rules," which, not surprisingly, lists 25 work rules. This document explains that an employee who violates any of the listed rules may be disciplined and indicates that violations may, in some instances, lead to immediate dismissal. The Work Rules are quite similar to the General Conditions of Employment; Mr. MacAdams testified that the General Conditions of Employment were intended to clarify the Work Rules. TG distributed the Work Rules to its employees, and at some point during his employment with TG, Mr. Martinez signed a document acknowledging that he had received a copy of these rules.

The Wyoming Supreme Court has stated that when a company distributes employee handbooks that "list[] misconduct that could result in discharge, the handbooks imply that cause is required" for discharge. Leithead v. American Colloid Co., 721 P.2d 1059, 1063 (Wyo. 1986). We see no principled difference between an employee handbook and individual policies such as those distributed by TG. Thus, there is no reason to distinguish the present case from Leithead, where the Wyoming Supreme Court held that an employer that distributed an employee handbook could not terminate an employee unless he violated one of the

7

rules listed in the handbook.    See id.  Accordingly, we hold that the district court was correct when it ruled that there existed sufficient evidence from which a jury could find that Mr. Martinez possessed a contractual right to continued employment so long as he did not violate the rules set forth in the General Conditions of Employment and the Work Rules.

B.    TG's Absence Policy

The district court also determined that TG's Personnel Policy 5.0, entitled "Absence," was a part of the employment contract between TG and Mr. Martinez. TG's Absence Policy lists, among other things, the company's disciplinary policies and procedures regarding unexcused employee absences.  TG made this policy available for its employees to review, and Mr. Martinez did, indeed, review this policy during his tenure with the company.    The Wyoming Supreme Court has held that when a company distributes an employee handbook that lists disciplinary procedures, it "create[s] an expectation on the part of an employee that [those procedures] will be followed" and, hence, is contractually bound to adhere to those procedures.    See Mobil Coal Producing Co. v. Parks    , 704 P.2d 702, 707 (Wyo. 1985).  Accordingly, we hold that the district court was also correct when it determined that a genuine issue of material fact existed as to whether TG was contractually bound to adhere to the procedures set forth in the Absence Policy.

III.    **TG Did Not Breach Mr. Martinez's Implied Employment Contract**

8

**A. TG's Work Rules And General Conditions of Employment**

Both the Work Rules and the General Conditions of Employment provide that employees are required to notify their supervisors prior to missing a scheduled shift and that unexcused absences from three shifts within a twelve-month period will be cause for dismissal. See Aplt's App. at 286, 292. The district court granted summary judgment to TG because it found that the undisputed facts demonstrated that Mr. Martinez had missed more than three shifts from April 1-12, 1996 and that he had failed to provide notification to his supervisor prior to those absences. Mr. Martinez contends that when the evidence is viewed in the light most favorable to him, it reveals a genuine issue of material fact as to whether he notified TG prior to the April 1-12 absences and whether those absences were, in fact, excused.

To demonstrate that Mr. Martinez notified TG prior to his April 1-12 absences, he points to the deposition testimony of Todd Brichacek and Michael Hunt, two supervisors at TG. However, neither man's testimony bears out Mr. Martinez's argument. Mr. Brichacek merely testified that when Mr. Martinez's foreman inquired about Mr. Martinez's status at some unspecified time, Mr. Brichacek responded that as far as he knew, Mr. Martinez was "getting treated." See id. at 229. Mr. Hunt's testimony is even less helpful to Mr. Martinez: It

9

establishes that Mr. Hunt could not recall when he was notified about Mr. Martinez's absences. See id. at 235.

The undisputed evidence demonstrates that on March 13, 1996, Mr. Martinez telephoned TG and informed the company that he would be out of work from March 13 until March 31 due to his back injury. At some point thereafter, Mr. Martinez submitted a doctor's note to TG indicating that he would be out of work from March 13-31. On or about April 14, Mr. Martinez submitted another doctor's note to TG stating that he was continuing to seek treatment for his back injury and that there should be no change in his working status until his doctor received the results of a CT scan. Thus, the undisputed evidence shows that Mr. Martinez failed to contact TG prior to his April 1-12 absences in order to notify the company that he would miss work during that period.

Moreover, even if he had come forward with evidence of prior notification, he has failed to show that his April 1-12 absences were excused. Both the Work Rules and the General Conditions of Employment provide that an absence will be deemed unexcused if the employee is unable to provide a sufficient explanation for missing work and that three unexcused absences are cause for termination. The Work Rules specify that "the opinion of the employee's supervisor and/or department head" controls whether an absence should be deemed excused. See Aplt's App. at 286.

Mr. Martinez does not dispute that TG was entitled to exercise discretion in deciding whether his absences should have been excused. However, he points to numerous provisions in various TG policies and memoranda, as well as Wyoming's implied covenant of good faith and fair dealing, see Wilder v. Cody County Chamber of Commerce, 868 P.2d 211, 220 (Wyo. 1994), and argues that the company's discretion is not boundless. Mr. Martinez contends that the company is contractually required to exercise its discretion "in a fair manner, after thorough investigation, with caution and only after consideration of all the facts and extenuating circumstances." Aplt's Brief at 39.

Even were we to accept Mr. Martinez's argument, he has failed to identify any evidence showing that TG acted in anything other than a reasonable and thorough manner in determining that his absence was unexcused. Rather, Mr. Martinez simply asserts baldly that "[t]here are definite issue[s] of fact as to whether or not Defendant breached the contract by failing to exercise its discretion within the guidelines set forth in the remainder of the contract." See id. However, "[w]ithout a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1546 (10th Cir. 1995) (quotation omitted).

In addition, the undisputed evidence demonstrates that prior to discharging Mr. Martinez, TG held several meetings with him to discuss his condition, gave him a full month to provide the company with documentation showing that he was unable to work during his absences, and examined all of the medical records that he submitted to the company in an attempt to justify his absences. We find it particularly telling that not one of Mr. Martinez's doctors would provide him with a simple note excusing his April 1-12 absences. See also Aplt's App. at 306 (TG's Short Term Disability Income Plan) ("A doctor's certificate attesting to an employee's absence due to illness will be required when, in the opinion of management, the absence is abusive."). Under these circumstances, no reasonable trier of fact could determine that TG handled this matter in anything other than a fair and thorough fashion.

**B.      TG's Absence Policy**

Mr. Martinez also directs our attention to the following passage from TG's Absence Policy:

> Any absence not determined under the provisions . . . to be excused shall be deemed   unexcused , and the following penalties shall apply without discretion:
>
> A.      First day of unexcused absences     :  Recorded warning and loss of salary.
>
> B.      Second unexcused absence     within a 12 month period of the first unexcused absence:  Suspension from work without pay for three consecutive work turns . . . .

12

C.    <u>Third unexcused absence</u>   within a 12 month period of the first unexcused absence:  Termination.

Aplt's App. at 304-05 (emphasis in original).  Mr. Martinez argues that the Absence Policy requires progressive discipline and, thus, that TG violated this policy when it failed to impose the penalty for his first unexcused absence (recorded warning and loss of salary) prior to imposing more serious penalties for his subsequent unexcused absences.

Mr. Martinez, however, failed to come forward with any evidence demonstrating that TG's Absence Policy requires progressive discipline.  Although it is true that the policy listed the penalties in ascending order of seriousness, there is nothing in its language suggesting that TG's right to impose the more serious penalties is contingent upon the company's previously having placed a recorded warning in the employee's file and docked his pay.  Rather, the policy simply provides that three unexcused absences will automatically result in an employee's termination.

Perhaps our decision would have been different if Mr. Martinez had shown that he had detrimentally relied on TG's failure to issue him a written warning.  However, TG provided Mr. Martinez with ample notice that his job was in jeopardy and afforded him repeated opportunities to justify his absences.  It was only after Mr. Martinez had missed more than a month of work and demonstrated an inability to account for many of those absences that TG finally terminated his

13

employment. Of course, at the meeting in which it discharged Mr. Martinez, TG could have gone through the formality of issuing him a written warning before firing him. However, requiring the company to jump through such a pointless hoop would neither further TG's policies nor serve Mr. Martinez's interests.

In sum, we will not allow Mr. Martinez to profit from TG's lenity (or, perhaps, oversight) in failing to penalize him after his first unexcused absence. Under the facts of this case, TG's failure to issue a written warning did not work to Mr. Martinez's detriment, and it did not preclude the company from later terminating him when he subsequently continued to amass unexcused absences.

## CONCLUSION

Although Mr. Martinez demonstrated a genuine issue of material fact regarding the existence of an implied contract of employment, he failed to adduce any evidence that TG breached that contract. Consequently, we hereby AFFIRM the district court's grant of summary judgment to TG.

Entered for the Court,

Robert H. Henry
Circuit Judge